# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| QUARNITA JAMES,[1] LAZERICK JAMES, and JAYLIN STIGER, | ) ) ) | |
| Plaintiffs, | ) ) | No. 21-CV-6750 |
| v. | ) ) ) | Judge John J. Tharp, Jr. |
| THE CITY OF CHICAGO; Chicago police officers GUADALUPE AGUIRRE (star #12810); ) MOHAMMED AHMED (#16497); GREGORY STRANSKI (#); AMIN ELMESQUINE (#17593); DANIEL GAJEWSKI (#5149); ) JESADA LAKSANAPROM (#7480); ALEX LOPEZ (#12666); KEVIN MCCORMICK (#16845); CHRISTOPHER PAREDES (#18109); Sgt. SYED QUADRI (#2406); JEFFREY RIORDAN (#7712); ) Sgt. CHRISTOPHER STACHULA (#1668); ZOHAIB ZAIB (#10988); and other CURRENTLY UNKNOWN CHICAGO POLICE OFFICERS, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Quarnita James and her sons, Jaylin Stiger and Lazerick James, brought this case alleging violation of 42 U.S.C. § 1983 and Illinois state law by Defendants Guadalupe Aguierre, Gregory Stranski, Amin Elmensquine, Daniel Gajewski, Jesada Laksanaprom, Alex Lopez, Kevin McCormick, Christopher Paredes, Syed Quadri, Jeffrey Riordan, Christopher Stachula, Zohaib Zaib, and other currently unknown Chicago police officers (together, the "Defendant Officers")

---

[1] Plaintiff Quarnita James also brought suit on behalf of her sons, Jaylin Stiger and Lazerick James, who were minors at the time of the events at issue and when this suit was filed. Stiger and James are now adults, competent to assert the claims on their own. Accordingly, the Clerk of the Court is directed to amend the case caption to reflect that Ms. James brings only a personal claim.

and the City of Chicago ("City"). Before the Court is the defendant's motion for summary judgment. For the following reasons, the defendant's motion is granted in part and denied in part.

## BACKGROUND

Plaintiffs initiated this case on December 20, 2021. *See* R. 1.[2] The operative Amended Complaint was filed on May 24, 2022, which contains fifteen counts: (1) a *Monell* claim under Section 1983; (2) a violation of the Fourth Amendment's Equal Protection Clause; (3) unlawful warrantless entry in violation of the Fourth Amendment under Section 1983 for Incident 2[3]; (4) excessive use of force in violation of the Fourth Amendment under Section 1983; (5) unreasonable manner of entry and search in violation of the Fourth Amendment under Section 1983; (6) unlawful warrantless entry in violation of the Fourth Amendment under Section 1983 for Incident 4; (7) unlawful seizure in violation of the Fourth Amendment under Section 1983; (8) assault under Illinois law; (9) battery under Illinois law; (10) intentional infliction of emotional distress under Illinois law; (11) trespass under Illinois law; (12) failure to retreat under Illinois law; (13) failure to intervene under Section 1983; (14) *respondeat superior* under Illinois law; and (15) indemnification under Illinois law. *See* R. 45. The defendants filed a joint motion for summary judgment on June 19, 2023, seeking summary judgment in favor of all claims against them. *See* R. 111 and R. 116.

The following facts are taken from the parties' Local Rule 56.1 statements of undisputed material facts and the corresponding responses. *See* N.D. Ill. L.R. 56.1; *see also*, R. 143; R. 117; R. 140; R. 158. The following facts are taken from the record and are undisputed unless otherwise noted. Disputed facts are included only to the extent supported by record citations and only where material. *See Senske v. Sybase, Inc.*, 588 F.3d 501, 503 n.1 (7th Cir. 2009) (facts are properly disputed only with citations to evidence that directly contradicts opponent's assertions). The facts and inferences therefore are construed in favor of the nonmoving party. *See Cung Hnin v. TOA (USA), LLC*, 751 F.3d 499, 503-504 (7th Cir. 2014).

On Dec. 24, 2019, plaintiffs Quarnita James and her two sons, sixteen-year-old Jaylin Stiger and thirteen-year-old Lazerick James, lived together at 1227 West Albion Avenue in Chicago, Illinois (hereafter "1227 Albion") in Apartment #3D. R. 143 ¶ 1-2, 6. The events underlying this lawsuit involved a series of encounters between the plaintiffs and the defendant officers on that night. At around 7:30pm that evening, Stiger was on the train home from Old Orchard Shopping Center in Skokie. *Id.* ¶ 5. When he reached the Loyola stop, he ran into a classmate, Terrell Herbert, outside the station. *Id.* ¶ 6. Stiger followed Herbert to a parking garage

---

[2] Citations to the docket are indicated by "R." followed by the docket number, and, where necessary, a page or paragraph citation.

[3] While this case involves many facts and events, the plaintiffs' claims arise from only four key incidents between the police and the plaintiffs. For the sake of clarity, the Court has assigned a number to each incident, and will refer to each incident by its number, as follows: the alleged tackling, handcuffing and gun-pointing at Stiger outside of 1227 Albion ("Incident 1"); Quadri's alleged entry into Apartment 3D ("Incident 2"); Lopez and Gajewski's alleged questioning of Stiger ("Incident 3"); and Aguirre and Laksanaprom's alleged entry into Apartment 3D and subsequent gun-pointing ("Incident 4").

across the street. *Id*. The garage, located at 1208 W. Aruthur Avenue in Chicago, Illinois, was regularly used by individuals going to the Morgan Apartment Complex across the street or the nearby CVS store. *Id.* ¶ 2b, 6. It was also a common hang out spot for students at Sullivan High School and other high schools in the area. *Id.* ¶ 6. The garage had multiple no trespassing signs. R. 117 ¶ 7. In the parking garage, Stiger and Herbert met up with a few other friends, and they began "socializing and horsing around" on the fourth floor. R. 143 ¶ 6-7.

Meanwhile, Chicago Police Department Officers responded to a report by the concierge at the Morgan that there were trespassers inside the garage—specifically, three black male teenagers who did not live at the Morgan, who were loitering on the fourth floor, and "up to no good." R. 143 ¶ 2a, 10. In response, at least nine officers arrived on the scene. R. 143 ¶ 13. When officers approached the group, the teenagers, including Stiger, fled. R. 143 ¶ 17; R. 117 ¶ 7. Defendants Stranski and Riordan chased after the teens. R. 143 ¶ 25; R. 117 ¶ 8.

Stiger "sprinted home" to his nearby residence at 1227 Albion. R. 143 ¶ 28. Stiger used his key fob to enter back door of the building and waited just inside the door for Herbert, who arrived shortly thereafter. *Id*. Once inside the building, believing police officers were no longer chasing them, Stiger and Herbert stopped to catch their breath and then headed upstairs to Stiger's apartment. *Id*. Meanwhile, Stranski, who had been following the teenagers, requested backup after seeing one of the teens pulling the blinds down over the second-floor hallway window at 1227 Albion. R. 143 ¶ 34, 37; R. 117 ¶ 12-14. Defendants also assert that Stranksi had also seen Stiger and Herbert struggling to enter the rear door of 1227 Albion, and that Stranski had seen a nail clipper outside of the door, which he "believed had been used to open the door." R. 117 ¶ 10. Plaintiffs dispute this characterization, stating that Stranksi did not see anything "at any time prior to seeing the teenager through the second-floor window." R. 143 ¶ 35.

Defendants Aguirre and Laksanaprom responded to Stranski's call for backup and joined him at the rear entry door, where Stranski told them that the teens had run back to 1227 Albion from the Morgan parking lot, were in the stairwell and had closed the blinds, and had picked the lock to the apartment building. R. 143 ¶ 40; R. 117 ¶ 14. The officers then saw, through the glass on the rear entry door of the building, Stiger and Herbert entering the rear door of Apartment 3D. R. 143 ¶ 41. After Stranski used a "Leatherman" tool to open the front door of 1227 Albion, Stranski, Aguirre and Laksanaprom then entered the building, walked up the stairs, and stationed themselves outside the rear apartment door of Stiger's unit, where they waited for thirteen minutes. R. ¶ 43; R. 117 ¶ 13. At this point, numerous other officers—including Quadri, Ahmed, Zaib, McCormick, Paredes, and Riordan—arrived in the Albion parking lot and went to the front side of the building and began "checking the various front entrance doors." R. 143 ¶ 42; R. 117 ¶ 14.

## I.    **Incident 1: Quadri and Zaib Tackle/Takedown Stiger**

As the officers were checking the doors, Stiger and Herbert exited Apartment 3D and walked out of the front door of 1227 Albion. R. 143 ¶ 47. Ahmed walked toward Stiger and touched his shoulder "as if to say hold up right there." R. 143 ¶ 48; R. 117 ¶ 20. Shortly thereafter, Quadri and Zaib "sprinted full-steam at" Stiger and "forcefully lifted [him] up off the ground and tackled [him] to the ground." R. 143 ¶ 49. Plaintiffs assert that Zaib "got to Jaylin first" and "grabbed his chest," and Quadri "sprinted at him and tackled him to the ground." *Id*. Defendants dispute this, asserting that Quadri "began running towards" the teens because he "perceived them to be fleeing," prompting Quadri to perform an "emergency takedown" of Stiger "to control him and prevent him

3

fleeing" by holding him by his torso, and that Stiger "went to the ground of his own accord causing Sgt. Quadri to fall with him" without Quadri needing to use any force. R. 117 ¶ 21-22.

Stiger maintains that at same time Quadri and Zaib were tackling him, Paredes and another officer drew and pointed a black handgun and yellow taser directly at him for several seconds. R. 143 ¶ 51. Defendant's dispute this, stating that the officers did not draw their firearms. R. 117 ¶ 32. McCormick handcuffed Stiger, who was lying face down on the ground. R. 143 ¶ 52; R. 117 ¶ 23. McCormick and Zaib searched Stiger's clothing. R. 143 ¶ 54; R. 117 ¶ 24. McCormick found and removed Stiger's housekeys. R. 143 ¶ 55. McCormick gave the keys to Ahmed, who, accompanied by Quadri and Elmesquine, used the keys to unlock and open the door of 1227 Albion. R. 143 ¶ 58, 61; R. 117 ¶ 40-41. Ahmed then used Stiger's keys to unlock Apartment #3D. R. 143 ¶ 59, 61; R. 117 ¶ 40-41.

## II. Incident 2: Quadri's Entry

During these events, Stiger's 13-year-old brother James was home by himself. After Ahmed unlocked the apartment, Quadri pushed the door open and announced "police." R. 143 ¶ 62117 ¶ 43. The parties dispute whether Quadri entered the apartment: plaintiffs assert that Quadri then "affirmatively cross[ed] the threshold of the door," taking a few steps and looking around inside the apartment. R. 143 ¶ 62. Defendants dispute this, asserting that Quadri "propped the door open with his arm," but remained in the hallway and never "stepped across the threshold into Plaintiffs' apartment." R. 117 ¶ 45. The parties also dispute the timing of when Quadri knocked: the plaintiffs assert that Quadri announced "police," crossed the threshold of the door, and *then* knocked; defendants state that Quadri called out "police" and knocked on the door simultaneously, and never crossed the threshold at all. R. 143 ¶ 62; R. 117 ¶ 43. The body camera footage— including both plaintiffs' and defendants' video evidence—plainly establishes that Quadri opened the door before identifying himself as a police officer and only knocked on the door after it was open. P-11[4] at 1:52:52; D-21 at 1:52:52. Quadri engaged in a brief conversation with James, asking if he was ok and then asking questions about whether Stiger lived in the unit and if he had recently been home. R. 143 ¶ 63; R. 117 ¶ 44. Quadri, having confirmed that Stiger lived in the apartment and had not broken in, uncuffed and released Stiger and Herbert, who were still outside. R. 143 ¶ 65; R. 117 ¶ 52. None of the officers used their radios to inform other officers that the teenagers had been released. R. 143 ¶ 64.

Having been released, Stiger and Herbert walked to Loyola Station. R. 143 ¶ 66. Defendant Riordan, who had left 1227 Albion about five minutes earlier, encountered Stiger and Herbert approaching the front entrance of the station. R. 143 ¶ 66. Riordan stopped and questioned Stiger and Herbert for about one minute. After Stiger told Riordan that the other officers had let them go, Riordan released Stiger, but continued to pursue Herbert, who had begun to walk away,

---

[4] Citations to body camera footage indicated by "P-#" or "D- #," referring to the parties' respective body camera footage exhibits. For clarity, the Court has attached an appendix to the end of this Opinion with the parties' body camera footage exhibit numbers and links. *See* App. A. The Court requests that the parties use the same naming system to refer to body camera footage moving forward. The Court notes that many of the defendants' and plaintiffs' body camera exhibits are identical—the Court cites to both where relevant for completeness.

northbound on Sheridan. R. 143 ¶¶ 66-67. Riordan radioed that the suspect in the green jacket was running northbound on Sheridan and various officers, including Quadri (who had just released Stiger and Herbert minutes before), caught and arrested Herbert. R. 143 ¶ 68; R. 117 ¶ 64.

### III.     Incident 3: Lopez and Gajewski's Questioning

Meanwhile, Stiger walked back home from Loyola Station and entered his apartment. R. 143 ¶ 74. Lopez and Gajewski, who had remained in the building, saw Stiger entering the rear door of the building, and called out for him to come over to them. *Id.* ¶ 74. Stiger came down the stairs to meet the officers on the apartment's ground floor. *Id.* ¶ 77. The officers questioned Stiger. *Id.* Stiger answered the officers' questions and told them that he had already been released by the police. *Id.* The officers then released Stiger, who returned to his apartment. *Id.*

### IV.     Incident 4: Aguirre and Laksanaprom's Entry

Defendants Aguirre and Laksanaprom were also still at 1227 Albion. *Id.* ¶ 81; R. 117 ¶ 71. From the outside of the building, Laksanaprom shined a flashlight into the front windows of the plaintiff's apartment and said to Aguirre that he saw someone looking at him. R. 143 ¶ 81; R. 117 ¶ 71. Laksanaprom then said to Aguierre, "let's go inside." R. 143 ¶ 81. Without calling for backup or telling their supervisors or other officers that they were reentering the building, *Id.* ¶ 82, Laksanaprom and Aguirre entered the building and pulled on the front doorhandle of apartment 3D. Aguirre then shouted: "Hey! Listen…At some point, this door is going to be broken open and you will be dragged out. You want to do this now or later? Open this door!" *Id.* ¶ 85; R. 117 ¶ 73. Stiger, who had returned to the apartment only seconds before, opened the door. R. 143 ¶ 86. According to the plaintiffs, Aguierre and Laksanaprom drew and pointed their weapons, including a firearm and a taser, respectively. R. 143 ¶ 86. Defendants dispute this, saying that Laksanaprom drew "his taser at the low ready position pointing downwards and a little off to the side," and Aguirre drew "his firearm at the low ready position." R. 117 ¶ 73.

The defendants ordered Stiger to get down on the ground on his knees. R. 143 ¶ 87. Stiger complied, lying face down on the floor with his arms spread out. *Id.* ¶ 88; R. 117 ¶ 76. Laksanaprom then handcuffed Stiger with his arms behind his back, while he remained on the floor. R. 143 ¶ 88. While this was going on, Stiger repeatedly told the officers that he had already been questioned and released multiple times, and that his brother was in the back of the house. R. 143 ¶ 88. Plaintiffs assert that Aguirre proceeded into the apartment with his gun drawn and pointed directly ahead, with his gun in both hands. R. 143 ¶ 88; R. 117 ¶ 81. Defendants state that Aguirre pointed his firearm in order to use "the light mounted on his firearm to illuminate the areas in which he was looking." R. 117 ¶ 81.

Aguirre moved through the different rooms in the apartment, still with his gun raised. *Id.* ¶ 89; R. 117 ¶ 81. Aguirre asked Stiger if his brother had a gun, and Stiger said that he did not. R. 143 ¶ 90. Plaintiffs allege that Aguirre then directed James to come out, and when he did, Aguirre pointed his gun directly at James and told James to get on his knees. *Id.* ¶ 92. Defendants dispute the gun pointing, stating that Aguirre "point[ed] his gun downward the second James [was] observed in the doorway to the bedroom." R. 117 ¶ 82. James complied and got on his knees. R. 143 ¶ 93; R. 117 ¶ 83. Aguirre then pushed James against the hallway wall and placed his hands over his head against the wall. R. 143 ¶ 94; R. 117 ¶ 83. Aguirre then handcuffed James against the wall. R. 143 ¶ 95; R. 117 ¶ 83. Plaintiffs state that Aguirre then "forcefully pulled" James up to his feet and "forcefully maneuvered" him to the front of the apartment. R. 143 ¶ 96. Defendants state that James was "not being dragged or pulled." R. 117 ¶ 83. Out in the hallway, Laksanaprom

brought Stiger, still handcuffed, to his feet. R. 143 ¶ 97. The officers questioned the boys about whether they lived in the apartment. *Id*. Stiger reiterated that he had been stopped and released by other officers. *Id.* ¶ 98.

Quadri and several other officers then arrived at the apartment building. *Id.* ¶ 99. The officers asked Aguirre and Laksanaprom via radio to be let in to the building. *Id.* When Quadri arrived at the plaintiff's apartment, he explained to Aguirre and Laksanaprom that Stiger had already been stopped and cleared. *Id.* ¶ 101; R. 117 ¶ 86. Aguirre and Laksanaprom uncuffed James and Stiger. R. 143 ¶ 101; R. 117 ¶ 86. The officers then left the building. R. 143 ¶ 103.

## DISCUSSION

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is "material" if it might affect the outcome of the case under the governing law, and a dispute is "genuine" if a reasonable jury could return a verdict for the nonmoving party based on the evidence presented. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The moving party bear the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). If that burden is met, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial," not merely rely on allegations in the pleadings. *Anderson*, 477 U.S. at 256. In deciding a motion for summary judgment, the Court does not weigh evidence or make credibility determinations; those tasks are reserved for the jury. *Tolan v. Cotton*, 572 U.S. 650, 656 (2014). Instead, the Court must view all the evidence and draw all reasonable inferences in the light most favorable to the non-movant. *Id.*; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Where video footage is in the record, the Court views the footage in the light most favorable to the non-moving party unless the video "blatantly contradict[s]" that party's version of events such that no reasonable jury could credit it. *Scott v. Harris*, 550 U.S. 372, 380 (2007).

The Court addresses the plaintiffs' claims in the following order. First, the Court considers the plaintiffs' Fourteenth Amendment claim (Count 2). The Court then turns to the plaintiffs' Fourth Amendment claims (Claims 3-7). The Court next considers the plaintiffs' Failure to Intervene claim under § 1983 (Count 13). The Court then evaluates the plaintiffs' *Monell* claim (Count 1). Finally, the Court considers the plaintiffs' state-law claims (Claims 8-12 and 14-15). The Court analyzes each claim in turn to determine whether summary judgement in favor of the defendants is warranted. Because multiple defendants are named in this action, not all claims apply to every defendant. Thus, where relevant, the Court evaluates summary judgment as to each defendant within each claim.

### I.      Fourteenth Amendment Claim (Count 2)

The plaintiffs allege a violation of the Fourteenth Amendment's Equal Protection Clause, U.S. Const. amend. XIV, § 1, against "all named defendant officers who profiled and targeted them, stopped, seized and detained them, and/or entered their building and apartment on December 24, 2019." R. 45 ¶¶ 127-130. This claim is asserted against all the defendant officers. *Id.* The defendant officers move for summary judgment on this claim, arguing that the plaintiffs cannot establish that any of their interactions with the officers occurred because of the plaintiffs' race. *See* R. 16 at 49.

Plaintiffs do not respond to the defendant's argument in their opposition to summary judgment, nor do they address the equal protection claim at all. *See* R. 144. Arguments not developed in response to a motion for summary judgment are treated as abandoned. *See, e.g., Palmer v. Marion County*, 327 F.3d 588, 597-98 (7th Cir. 2003) (stating that "because Palmer failed to delineate his negligence claim in his district court brief in opposition to summary judgment…his negligence claim is deemed abandoned"); *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument…results in waiver"); *Alioto v. Town of Lisbon*, 651 F.3d 715, 721 (7th Cir. 2011) (holding that a party "waives an argument by failing…to develop arguments related to a discrete issue").

Because the plaintiffs do not defend their equal protection claim at summary judgment, the Court treats the claim as abandoned and need not address the merits of the defendants' argument. Summary judgment is therefore granted to all defendant officers on Count 2.

## II. Fourth Amendment Claims (Counts 3-7)

The plaintiffs assert multiple claims under the Fourth Amendment pursuant to § 1983, including unlawful warrantless entry (Counts 3 and 6), excessive force (Count 4), unreasonable manner of entry and search (Count 5), and unlawful seizure (Count 7) arising from the officers' entry into the apartment and their interactions with the plaintiffs. R. 45 ¶¶ 131-178, 246-249. As these claims involve distinct legal standards, the Court addresses each claim separately.

### A. Unlawful Warrantless Entry (Count 3 and Count 6)

Counts 3 and 6 assert Fourth Amendment claims based on the alleged unlawful warrantless entry into the plaintiffs' apartment on Dec. 24, 2019.[5] The plaintiffs challenge two separate entries—one in each count. In Count 3, plaintiffs allege that at approximately 7:52 p.m., Quadri opened the plaintiffs' apartment door and entered the residence without a warrant or a valid exception to the warrant requirement ("Incident 2"). In Count 6, plaintiffs allege that at approximately 8:08 p.m., Aguirre and Laksanaprom forcibly entered the apartment, again without a warrant or a valid exception to the warrant requirement ("Incident 4").[6] Although plaintiffs plead these allegations as two separate counts based on two separate incidents, both claims arise under the same Fourth Amendment theory—whether officers unlawfully entered the plaintiffs' residence without a warrant or a valid exception to the warrant requirement. The Court therefore addresses Counts 3 and 6 under the same legal standard while analyzing the circumstances of each alleged entry separately.

---

[5] Plaintiffs have withdrawn their warrantless entry claims as to Defendants Riordan, Stranski, Zaib, McCormick, Paredes, Gajewski, and Lopez because the evidence establishes that these officers did not enter the plaintiffs' apartment. *See* R. 144 at n.22. Plaintiffs have also withdrawn any portion of their warrantless-entry claim based on officers' entry into the building's common areas, rather than the apartment unit itself, because such entry does not implicate the Fourth Amendment. *Id.*; *see also, United States v. Concepcion*, 942 F.2d 1170, 1172 (7th Cir. 1991) ("a tenant has no reasonable expectation of privacy in the common areas of an apartment building").

[6] The plaintiffs also observe that various officers entered another unit (#3B) in the same building after discovering that it was unlocked. They have no standing to press any claim as to those entries, however.

1. Legal Standard

The Fourth Amendment protects against unreasonable searches and seizures. U.S. CONST. amend. IV. An unlawful warrantless entry is a type of unreasonable search under the Fourth Amendment, which generally prohibits law enforcement officers from entering a person's home without a warrant. *See Payton v. New York*, 445 U.S. 573 (1980) ("[T]he Fourth Amendment has drawn a firm line at the entrance to the house."). Accordingly, warrantless entry into a residence is "presumptively unreasonable" unless an established exception to the warrant requirement applies, such as consent or exigent circumstances. *Id.* at 586-90; *see also Brigham City v. Stuart*, 547 U.S. 398, 402 (2006).

Exigent circumstances may justify a warrantless entry when officers reasonably believe that immediate action is necessary—for example, when the occupant of a residence is injured or in danger of imminent injury, when there is a danger posed to others by the occupant of the dwelling, when police are in "hot pursuit" of the suspect or there is a risk the suspect might escape, or to prevent the imminent destruction of evidence. *See Sutterfield v. City of Milwaukee*, 751 F.3d 542, 557 (7th Cir. 2014). Whether the exigent circumstances exception justifies warrantless action is judged by an objective standard. *Id.* The relevant question is whether, under the totality of the circumstances, it was reasonable for officers to believe that there was "a compelling need to act and no time to obtain a warrant." *Id.* When officers enter a home without a warrant, the burden is on the government to demonstrate that entry was justified by a valid exception to the warrant requirement. *See Welsh v. Wisconsin*, 466 U.S. 740, 749-50 (1984).

2. Analysis

a. *Incident 2 (Count 3)*

The Court first considers the alleged entry at approximately 7:52 p.m. Defendant Quadri seeks summary judgment on the basis that he never entered the apartment, and thus the plaintiffs have no claim under the Fourth Amendment for warrantless entry. R. 116 at 32. Without an entry, defendants argue, there can be no warrantless entry. *Id.*

The Court finds that there are genuine disputes of material fact regarding whether Quadri entered the apartment. The plaintiffs contend that Quadri pushed opened the plaintiffs' door and crossed the threshold of the door to the apartment. R. 144 at 49. Defendants dispute this, asserting that Quadri "propped the door open with his arm, but never stepped across the threshold into Plaintiffs' apartment." R. 116 at 31. Resolving this factual dispute would require the Court to weigh competing evidence and make credibility determinations—tasks that are reserved for the jury. *Cotton,* 572 U.S. at 656. The Court must next determine whether, viewing the evidence in the light most favorable to the plaintiffs, a reasonable jury could find that a constitutional violation occurred. The Court concludes that it could. Although body camera footage is part of the record, the footage does not "blatantly contradict[]" the plaintiffs' version of events such that no reasonable jury could credit it. *Harris,* 550 U.S. at 380. To the contrary, the video does plainly establish that Ahmed used the key recovered from Stiger to unlock the door, which Quadri then opened before identifying himself as a police officer, and only knocked on the door after it was open. P-11 at 1:52:52; D-21 at 1:52:52. Accordingly, the Court must evaluate the warrantless entry claim based on the facts as the plaintiffs describe them.

If a jury were to credit the plaintiffs' account, it could reasonably conclude that Quadri entered the apartment without a warrant and without an exception to the warrant requirement.

8

Plaintiffs contend that Quadri pushed the door open, crossed the apartment's threshold, and took several steps inside. R. 144 at 49. The Supreme Court has made clear that simply crossing the threshold of a home without a warrant or an exception to the warrant requirement can constitute a violation of the Fourth Amendment. *See Payton v. New York*, 445 U.S. 573 (1980) ("[T]he Fourth Amendment has drawn a firm line at the entrance to the house."). This was, to be sure, a minimal intrusion into the apartment, and if Quadri crossed the threshold, he did so by only a step or two, but a reasonable jury could credit the plaintiff's version of events and conclude that Quadri entered the plaintiffs' apartment without a warrant or an exception to the warrant requirement. Thus, summary judgment is inappropriate on this basis.

In the alternative, Quadri contends that his actions are cloaked in qualified immunity. R. 116 at 35-36. When facts material to a claim of qualified immunity remain in dispute, however, summary judgment is inappropriate. James Buchwalter et. al., *Federal Procedure, Lawyer* (§) 11:342. Without a settled set of facts, it is premature for the court to analyze the purely legal question of whether a defendant is entitled to qualified immunity. *See Morfin,* 349 F.3d at n. 13 ("Where there is a genuine issue of material fact surrounding the question of plaintiff's conduct, we cannot determine, as a matter of law, what predicate facts exist to decide whether or not the officer's conduct clearly violated established law."). Thus, because the facts related to Count 3 are disputed, a finding of qualified immunity is not feasible on this motion for summary judgment.

Because genuine disputes of material fact remain, a reasonable jury could find that an unlawful warrantless entry occurred, and the defendant is not entitled to qualified immunity at this juncture, summary judgment is therefore denied as to Defendant Quadri on Count 3.

### b. Incident 4 (Count 6)

The Court next considers the alleged entry that occurred at approximately 8:08 p.m. Defendants Aguirre and Laksanaprom seek summary judgment on the basis that their warrantless entry into the apartment was justified by exigent circumstances. R. 116 at 32.

Defendants contend that exigent circumstances existed because officers were pursuing two fleeing suspects who had allegedly forced entry into the building and who they observed entering Apartment #3D. *Id.* According to the defendants, officers had reason to believe that one of the suspects might have been armed because Stranski reported that the individual appeared to be holding his side while running. *Id.* at 33. Aguirre and Laksanaprom believed the suspects were still inside the apartment, and, after observing movement inside the unit, entered the apartment to clear it for officer safety. *Id.*

Plaintiffs dispute this characterization, contending that there was no sign of forced entry to the building and no indication that anyone was in danger or required immediate assistance. R. 144 at 60-61. Plaintiffs argue that there was no reason to think either teen was armed, and state that Stranski did not say anything to Aguirre and Laksanaprom about a weapon either over the radio or in person. *Id*. Plaintiffs also argue that the suspected offense prompting the police response— misdemeanor trespass—was too minor to give rise to an exigency that permitted warrantless entry. R. 144 at 59, quoting *Welsh*, 466 U.S. at 753 (stating that the gravity of the offense is an important factor to consider in determining whether an exigency exists). Plaintiffs further state that the circumstances did not present a rapidly unfolding emergency that would have prevented officers from securing the scene and obtaining a warrant before entering the apartment, and that the officers themselves pondered aloud alternatives to forced entry, including calling the management office for assistance in being let in to the plaintiffs' apartment. *Id.* at 63. Resolving these disputes would

9

require the Court to weigh competing evidence and make credibility determinations—tasks that are reserved for the jury. *Cotton,* 572 U.S. at 656.

Viewing the evidence in the light most favorable to the plaintiffs, a reasonable jury could conclude that exigent circumstances did not justify the warrantless entry. Although body camera footage is part of the record, the footage does not "blatantly contradict" the plaintiffs' version of events such that no reasonable jury could credit it. *Harris*, 550 U.S. at 380; P-10 at 2:09:00 (showing Aguirre and Laksanaprom's entry into Apartment 3D); D-14 at 2:09:00 (same). In fact, the video evidence supports the plaintiffs' argument that the misdemeanor trespass was too minor of an offense to constitute an exigency, and that the police themselves acknowledged that the offense was minor. For example, body camera footage records Stachula saying to Stranski, "it's just a trespass, don't kill yourself [trying to chase down the suspects]". When Stranski responds "ehh, it was more than that, they weren't running for trespass," Stachula responds, raising his voice, "it's a trespass, that's all you got, that's all you got!" P-19 at 2:03:27. Accordingly, the Court must evaluate the warrantless entry claim based on the facts as the plaintiffs describe them.

Thus, if a jury were to credit the plaintiffs' account, it could reasonably find that officers lacked an objectively reasonable basis to believe that a suspect was armed or that anyone inside the apartment posed an immediate threat. A jury could also conclude that the circumstances did not present the type of rapidly unfolding emergency that would have prevented officers from securing the scene and seeking a warrant before entering the residence. Under the totality of the circumstances, a reasonable jury could therefore conclude that it was not reasonable for officers to believe that there was "a compelling need to act and no time to obtain a warrant." *Sutterfield*, 751 F.3d at 557. Accordingly, summary judgment is inappropriate on this claim.

Aguirre and Laksanaprom alternatively argue that they are entitled to qualified immunity. When material facts relevant to the existence of a constitutional violation remain disputed, however, the Court cannot resolve the qualified immunity question at the summary judgment stage. *See Morfin,* 349 F.3d at n. 13. Because the existence of exigent circumstances depends on contested facts regarding what the officers reasonably perceived at the time of entry, the Court cannot determine as a matter of law whether Aguirre and Laksanaprom are entitled to qualified immunity. Accordingly, summary judgement is denied to Defendant Aguirre and Laksanaprom on Count 6.

## B. Unreasonable Manner of Entry and Search (Count 5)

The plaintiffs assert a Fourth Amendment claim alleging that officers executed the entry into their apartment in an unreasonable manner.[7] *See* R. 45 ¶¶ 151-156. Defendants move for summary judgment, arguing that the undisputed facts show that no officer violated the plaintiffs' constitutional rights. *See* R. 116 at 35.

---

[7] Plaintiffs have withdrawn their claims have also withdrawn their entry-based claims as to Defendants Riordan, Stranski, McCormick, Paredes, Gajewski, and Lopez, after discovery revealed that these officers did not enter the apartment. *See supra* n. 3; *see* R. 144 n. 22. Accordingly, Count 5 proceeds only as to the officers alleged to have entered the apartment: Quadri, Aguirre, and Laksanaprom.

Before turning to the merits, the Court first addresses defendants' argument that the plaintiffs waived Count 5 by failing to develop the unreasonable manner of entry claim in their response to summary judgment. *See* R. 161 at 36-37. Defendants further contend that plaintiffs instead raised an entirely new claim in their response to summary judgment—a "knock and announce claim"—asserting that officers violated the Fourth Amendment by failing to knock and announce before entering the apartment. *Id.* at 27. According to the defendants, this constitutes an improper attempt to raise a new claim at the summary judgment stage. *Id.*

The Court disagrees. The knock-and-announce requirement regulates the manner in which the officers execute an entry into the residence and is a common basis upon which a plaintiff can assert that an entry was carried out in an unreasonable manner under the Fourth Amendment. *Richards v. Wisconsin*, 520 U.S. 385, 392 (1997) (discussing the knock-and-announce rule as part of the inquiry into the "manner in which a search was executed"); *United States v. Maxwell*, 85 F.4th 1243, 1248 (7th Cir. 2023) (evaluating officers' compliance with the knock-and-announce rule when determining whether the "manner of entry" was reasonable). The Court therefore construes the plaintiffs' knock and announce argument as an articulation of the theory underlying their unreasonable manner of entry claim, rather than as the assertion of a new claim.

Even if plaintiffs had proffered "knock and announce" as a distinct legal theory at summary judgment, that would not necessarily preclude consideration of the argument. Because plaintiffs are not required to plead legal theories in their complaints, courts have discretion to permit refinement of legal theories at summary judgment so long as the underlying factual basis of the claim remains the same. *Whitaker v. Milwaukee County*, 772 F.3d 802, 808 (7th Cir. 2014) (quoting *Del Marcelle v. Brown Cty. Corp.*, 680 F.3d 887, 909 (7th Cir. 2012) (*en banc*)). *Higgins v. Lake Cnty. Cir. Ct. Clerk's Off.*, No. 17-CV-07637, 2021 WL 4206789, at *10 (N.D. Ill. Sept. 15, 2021). The rule differs when a party attempts to introduce a new factual basis for a claim at summary judgment. *Id.* at 859, 860; *Whitaker*, 772 F.3d at 808. Here, plaintiffs rely on the same factual allegations concerning the manner of the officers' entry that were pleaded in the complaint. Accordingly, the Court declines to treat Count 5 as waived.

Plaintiffs' unreasonable manner of entry claim arises from the same two incidents discussed in Count 3 and 6. First, plaintiffs allege that at approximately 7:52 p.m., Quadri entered the residence without first knocking and announcing ("Incident 2"). Second, the plaintiffs argue that at approximately 8:02 p.m., Aguirre and Laksanaprom entered the apartment without first knocking or announcing ("Incident 4").

1. Legal Standard

The Fourth Amendment protects against unreasonable searches and seizures. U.S. CONST. amend. IV. Unreasonable manner of entry is a type of unreasonable search under the Fourth Amendment. While a warrantless entry claim challenges the legality of the officers' *entry itself*, an unreasonable manner of entry claim challenges the legality of the *way* officers entered. *Tennessee v. Garner*, 471 U.S. 1, 8 (1985); *Brigham City*, 547 U.S. 398, 406 (2006). In other words, even if an officer has lawful authority to enter, he must still conduct the entry in a reasonable manner to avoid violating the Fourth Amendment. *Id.*

In determining whether the manner of entry was reasonable, courts examine the totality of the circumstances. One of the most important factors that courts consider when determining whether the manner of entry was reasonable is compliance with the "knock and announce rule." *Wilson v. Arkansas*, 514 U.S. 927 (1995) (failure to knock and announce can constitute

unreasonable manner of entry); *United States v. Maxwell*, 85 F.4th 1243 (7th Cir. 2023) (same). The Fourth Amendment requires officers to knock, announce their identity and purpose, and wait a reasonable period before attempting forcible entry. *See Wilson*, 514 U.S. at 929; *Richards v. Wisconsin*, 520 U.S. 358 (1997); *Ramirez*, 423 U.S. at 71 (1998); *United States v. Gillaum*, 372 F.3d 848, 854 (7th Cir. 2004). An unannounced entry may nevertheless be reasonable in certain circumstances, such as when officers reasonably believe that knocking and announcing would pose a threat of physical violence, allow a suspect to escape, or lead to the destruction of evidence. *Richards*, 520 U.S. at 394.

2. Analysis

 a. *Incident 2*

The Court first considers whether a genuine dispute of material fact exists regarding Quadri's conduct during Incident 2. The plaintiffs contend that Quadri entered the apartment "without *first* knocking and announcing and waiting a reasonable time for someone to come to do the door" (emphasis in original). R. 143 ¶ 62. Specifically, plaintiffs contend that he turned the door handle and propped it open with his foot, announced "police," waited only a few seconds, and then crossed the threshold into the apartment before he knocked. R. 143 ¶ 62. Defendants dispute this account. They assert that Quadri called out "police" and knocked on the door at the same time, propped the door open with his arm, and remained on the second-floor landing without stepping across the threshold. R. 117 ¶ 43, 45.

These factual disputes are material. Whether Quadri entered the apartment and whether he knocked before or after entering bear directly on whether he complied with the knock-and-announce rule. Resolving these factual disputes would require the Court to weigh competing evidence and make credibility determinations—tasks that are reserved for the jury. *Cotton,* 572 U.S. at 656.

The Court considers this a "factual dispute" at best, as the body camera footage—including both plaintiffs' and defendants' video evidence—plainly establishes that Quadri opened the door before identifying himself as a police officer and only knocked on the door after it was open. P-11 at 1:52:52 (Quadri knocking after opening door); D-21 at 1:52:52 (same). Not only does the body camera footage not "blatantly contradict[]" the plaintiffs' version of events, *Harris,* 550 U.S. at 380, it indisputably affirms at least a portion of the plaintiffs' position.[8] Accordingly, the Court must evaluate the unreasonable manner of entry claim based on the facts as the plaintiffs describe them.

Thus, the Court concludes that a reasonable jury could find that Quadri crossed the threshold of the apartment before knocking and announcing in violation of the plaintiffs' Fourth Amendment rights.

---

[8] This video evidence so incontrovertibly supports the plaintiffs' claim that Quadri failed to knock and announce that the Court considered granting summary judgment to plaintiffs on Count 5. However, because an unreasonable manner of entry claim requires an assessment of the totality of the circumstances, and failure to knock and announce is just one of the factors that courts consider, the Court declines to rule as a matter of law that the plaintiffs have established a Fourth Amendment violation for unreasonable manner of entry and are thus entitled to summary judgment.

Quadri alternatively argues that he is entitled to qualified immunity. However, when material facts underlying the constitutional analysis remain disputed, the Court cannot resolve the qualified immunity question at the summary judgment stage. *See Morfin,* 349 F.3d at n. 13. Accordingly, summary judgment is denied as to Defendant Quadri on Count 5.

### b. Incident 4

The Court next considers Incident 4, the alleged entry by Aguirre and Laksanaprom. Plaintiffs contend that these officers entered the apartment "without first knocking, announcing, and waiting a reasonable time." R. 144 at 49. Plaintiffs, however, do not develop this argument or cite record evidence to support a failure to knock and announce. *Id.* As discussed previously in this opinion, arguments not developed in response to a motion for summary judgment are treated as abandoned. *See Palmer,* 327 F.3d at 597-98. Thus, the Court considers Count 5 to be abandoned as to Aguirre and Laksanaprom. Accordingly, summary judgment is granted as to Defendants Aguirre and Laksanaprom on Count 5.

## C. Excessive Force (Count 4)

The plaintiffs assert that defendant officers Riordan, Zaib, McCormick, Paredes, Ahmed, Aguirre, Laksanaprom, and Quadri violated the Fourth Amendment by using excessive force against Stiger and James on Dec. 19, 2019. See R. 45 ¶¶ 36-46, 75-89. The defendants move for summary judgment, arguing that 1) some of the named defendant officers did not use any force against the plaintiffs, and 2) the defendant officers who did use force were justified in doing so. *See* R.116 at 36-37.

### 1. Legal Standard

Excessive force claims are evaluated under the Fourth Amendment's objective-reasonableness standard, which asks whether the force used was objectively reasonable in the light of the facts and circumstances confronting the officers. *Graham v. Connor*, 490 U.S. 386, 397 (1989). This objective analysis "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Stainback v. Dixon,* 569 F.3d 767, 771-72 (7th Cir. 2000).

Courts consider the totality of the circumstances when determining whether the amount of force used was excessive. *Jacobs v. City of Chi.*, 215 F.3d 758, 773 (7th Cir. 2000). The totality of the circumstances evaluation requires "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. "The particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Estate of Phillips*, 123 F.3d at 592.

At summary judgment, the Court must view the facts in the light most favorable to the plaintiffs and may not resolve disputes about what the officers did or perceived. *Chelios v. Heavner*, 520 F.3d 678, 685 (7th Cir. 2008). But factual disputes alone do not preclude summary judgment; the question is whether, taking plaintiffs' version of events as true, a reasonable jury could find that the force used was objectively reasonable. *Harris*, 550 U.S. at 381; *Weinnmann v. McClone*, 787 F.3d 444, 450 (7th Cir. 2015). If the force described by plaintiffs would not violate the Fourth Amendment as a matter of law, summary judgment remains inappropriate. If, on the

other hand, plaintiffs' version would allow a reasonable jury to find that officer used more force than was objectively necessary under *Graham*, summary judgment must be denied.

2. <u>Analysis</u>

The plaintiffs' claim of excessive force is based on several different incidents that occurred throughout the evening of Dec. 19, 2019, each of which involved different officers.

As to the claim overall, the Court finds that genuine disputes of material fact foreclose summary judgment. For example, the plaintiffs contend that officers pointed their firearms and tasers at them, while defendants assert that the officers merely held their weapons at a "low ready" position or were merely using their firearms as a flashlight. *Compare* R. 143 ¶ 5 (officers drew and pointed a gun and taser at Stiger), and *Id.* ¶ 86 (officers drew and pointed firearm and taser), and *Id.* ¶ 88 (officers proceeded into the apartment with gun pointed directly ahead), and *Id.* ¶ 81 (officer moved through different rooms in apartment with gun raised), and *Id.* ¶ 92 (officer pointed gun directly at James), *with* R. 117 ¶ 32 (officers did not draw firearms), and *Id.* ¶ 73 (firearms held at low ready), and *Id.* ¶ 81 (guns pointed to use as flashlight), and *Id.* ¶ 82 (guns pointed downward). Plaintiffs also contend that officers tackled Stiger, while the defendants maintain that Stiger went to the ground himself and the officer simply fell to the ground with him. *Compare* R. 143 ¶ 49 (Quadri "forcefully lifted" Stiger and "tackled [him] to the ground"), *with* R. 117 ¶ 22 (Stiger "went to the ground of his own accord causing Quadri to fall with him" without officers needing to use any force). These factual disputes go directly to the reasonableness of the officers' conduct under the Fourth Amendment. Resolving them would require the Court to weigh competing evidence and make credibility determinations—tasks that are reserved for the jury. *Cotton,* 572 U.S. at 656. Crediting plaintiffs' version of events, a reasonable jury could find that the officers used excessive force in violation of the Fourth Amendment.

As to the defendant officers implicated in this claim, the Court will address each defendant individually to determine whether to grant summary judgment to that defendant on the excessive force claim.

a. *Riordan, McCormick, and Ahmed*

Though the plaintiffs mentioned Riordan, McCormick and Ahmed in Count 4 in their Amended Complaint, *see* R. 45 ⁋ 146, they did not reassert this claim against these officers in their response to defendant's motion for summary judgment, *see* R. 144 at 36-77. As discussed previously in this opinion, arguments not developed in response to a motion for summary judgment are treated as abandoned. *See Palmer,* 327 F.3d at 597-98. The Court finds that the plaintiffs have abandoned their excessive force claims against Riordan, McCormick, and Ahmed. Thus, summary judgment is granted as to Defendants Riordan, McCormick, and Ahmed on Count 4.

b. *Zaib*

Plaintiffs assert that Zaib used excessive force during Incident 1, the encounter outside the apartment building. R. 143 ¶ 49. After Stiger walked out of the front of the Albion building, Zaib and Quadri allegedly "sprinted, full steam at" Stiger. R. 143 ¶ 49; P-11 at 1:47:03 (showing tackle/takedown); D-20 at 1:47:03 (same); P-12 at 1:47:10 (showing tackle/takedown); D-21 at 1:47:10 (same). Zaib reached Stiger first and grabbed him by the chest. *Id.* Quadri then tackled him to the ground. *Id.* Defendants' Rule 56.1 statement does not identify Zaib as involved in this encounter, defendants do not offer any Rule 56.1 statement facts addressing Zaib's actions during

this portion of the incident, or mention Zaib's involvement in this incident in their motion for summary judgment. R. 117 ¶ 21-22; R. 116 at 37-40.

The Court first asks whether there is a genuine dispute of material fact. Because plaintiffs attribute physical force to Zaib and defendants do not, a factual dispute exists as to whether Zaib charged at Stiger and physically grabbed him. Although body camera footage is part of the record, the footage does not "blatantly contradict[]" the plaintiffs' version of events such that no reasonable jury could credit it. *Harris,* 550 U.S. at 380. The body camera footage shows that Zaib was running ahead of Quadri, reached Stiger first, and made physical contact with Stiger. P-11 at 1:47:03 (showing Zaib ahead of Quadri before both making physical contact); D-20 at 1:47:03 (same). Accordingly, the Court must evaluate the excessive force claim based on the facts as the plaintiffs describe them. Taking plaintiffs' account as true, a jury could conclude that Zaib participated in a forceful takedown of a non-threatening minor—conduct that could be found objectively unreasonable under *Graham. Morfin*, 349 F.3d at 989 (denying summary judgment on excessive force where two officers tackled a passive, non-resisting individual). Because plaintiffs' version, if credited, could support a finding of excessive force, summary judgment is inappropriate. Accordingly, summary judgment is denied as to Defendant Zaib on Count 4.

### c. Quadri

Plaintiffs also assert that Quadri used excessive force during Incident 1. According to the plaintiffs, as Stiger left the 1227 Albion building, Zaib and Quadri "sprinted, full steam ahead" at him; Zaib grabbed Stiger by the chest, and Quadri forcefully lifted Stiger up off the ground and then tackled him to the ground. R. 143 ¶ 49a; P-11 at 1:47:03; D-20 at 1:47:03; P- 12 at 1:47:10; D- 21 at 1:47:10 (same). Plaintiffs contend that Stiger was not resisting or attempting to flee, and that the tackle constituted unnecessary and excessive force. R. 144 at 37-42.

Defendants dispute this characterization. They assert that Quadri performed a lawful "takedown" because he heard "Ahmed yell that two people were running" immediately before seeing Stiger, and thus he believed Stiger was attempting to flee. R. 116 at 40-42. Defendants further maintain that Quadri merely wrapped his arms around Stiger's waist to restrain him, and that Stiger moved downward of his own accord, pulling Quadri to the ground with him. *Id*. These conflicting accounts—of whether Quadri sprinted toward Stiger, whether Stiger was attempting to flee, and whether Quadri intentionally tackled him or was pulled to the ground—constitute disputes of material fact.

Although body camera footage is part of the record, the footage does not "blatantly contradict[]" the plaintiffs' version of events such that no reasonable jury could credit it. *Harris,* 550 U.S. at 380. On the contrary, the video evidence shows that Stiger came out of the building at a walking pace, and that Quadri and Zaib ran at Stiger, made physical contact with him, and all three of them ended up on the ground. P-13 at 1:47:06 (showing walking pace); D-22 at 1:47:06 (same); P-11 at 1:47:03 (showing tackle/takedown); D-20 at 1:47:03 (same); P-12 at 1:47:10 (showing tackle/takedown); D-21 at 1:47:10 (same). Accordingly, the Court must evaluate the excessive force claim based on the facts as the plaintiffs describe them.

Proceeding to the second step, the Court asks whether, crediting plaintiffs' version of events, a reasonable jury could find that Quadri used excessive force. The Seventh Circuit has recognized that taking a non-resisting individual to the ground can be objectively unreasonable. *See Morfin*, 349 F.3d at 989 (denying summary judgment on excessive force where two officers tackled a passive, non-resisting individual). Plaintiffs assert that Stiger—an unarmed minor—was

15

not resisting or evading the officers when Quadri ran at him and drove him to the ground. R. 144 at 37-42. If a jury accepted this account, it could find that Quadri used more force than reasonably necessary under *Graham.* Therefore, summary judgment is denied as to Officer Quadri on Count 4.

### d. Paredes

Plaintiffs assert that Paredes used excessive force during Incident 1. According to the plaintiffs, Paredes drew a firearm and pointed it at Stiger for several seconds. R. 144 at 42. Defendants deny that Paredes or any other officer pointed a weapon at Stiger during this incident. R. 116 at 37-38. Because plaintiffs and defendants offer conflicting accounts regarding whether Paredes pointed a firearm or taser at Stiger, a dispute exists that is material to the objective reasonableness inquiry under *Graham.*

The Court therefore proceeds to the second step: whether, accepting plaintiffs' version of events as true, a reasonable jury could find that Paredes violated the Fourth Amendment. Although body camera footage is part of the record, the footage does not "blatantly contradict[]" the plaintiffs' version of events such that no reasonable jury could credit it. *Harris,* 550 U.S. at 380. The Court notes that in the video footage, Paredes does not appear to be pointing a firearm. P-15 at 1:47:07 (showing tackle from Paredes' perspective, no view of his hands); D-25 at 1:47:07 (same). However, because the video does not show his hands, the Court cannot say that the video is so definitively that it "leaves no room for interpretation by the fact finder." *Kailin v. Vill. of Gurnee*, 77 F.4th 476, 481 (7th Cir. 2023) Accordingly, the Court must evaluate the excessive force claim based on the facts as the plaintiffs describe them.

The Seventh Circuit has recognized that the pointing of weapons at non-threatening minors can constitute excessive force. *See Baird*, 576 F.3d at 346-47 (pointing a firearm at non-resisting persons can be excessive force); *McDonald*, 966 F.2d at 294 (threatening a child with a firearm can violate clearly established Fourth Amendment law). If a jury credited the plaintiff's account—that Paredes pointed a firearm at Stiger during a moment when Stiger posed no threat—a jury could conclude that such conduct was objectively unreasonable. Because plaintiffs' version of events could support a finding of excessive force under *Graham*, summary judgment is denied as to Defendant Paredes under Count 4.

### e. Aguirre

Plaintiffs assert that Aguirre used excessive force during Incident 4, when he entered Stiger's apartment. According to the plaintiffs, after the officers commanded the plaintiffs to open the door, and Stiger complied, Aguirre pointed his firearm directly at Stiger's head and center mass and ordered him to get on his knees. R. 143 ¶ 86-87. Plaintiffs further assert that Aguirre entered and swept the apartment with his gun raised, and pointed the firearm directly at James, handcuffed James while he was facing the wall with his arms up, and then, a few minutes later, forcefully pushed him toward the front of the apartment, where the officers questioned him and Stiger. R. 143 ¶ 88-96. Defendants dispute this account and maintain that Aguirre kept his firearm pointed safely downward, only used the firearm because of its attached flight light in order to illuminate the room, did not use force to handcuff James, and did not forcefully push James toward the front of the apartment. R. 117 ¶ 81-83.

The Court first considers whether a genuine dispute of material fact exists. Because the parties present conflicting accounts regarding whether Aguirre pointed his firearm at the

occupants, whether he used force during handcuffing, and whether he physically pulled James toward the front of the apartment, these disputes are material to the Fourth Amendment reasonableness inquiry under *Graham.*

Proceeding to the second step of the summary judgment analysis, the Court asks whether, crediting plaintiffs' version of events, a reasonable jury could find that Aguirre used excessive force. Although body camera footage is part of the record, the footage does not "blatantly contradict[]" the plaintiffs' version of events such that no reasonable jury could credit it. *Harris,* 550 U.S. at 380. P-9 at 2:09:00 (Aguirre's firearm); D-11 at 2:09:00 (same); P-10 at 2:09:00 (Laksanaprom's taser); D-14 at 2:09:00 (same). Accordingly, the Court must evaluate the excessive force claim based on the facts as the plaintiffs describe them.

The Seventh Circuit has held that the pointing of firearms at non-resisting individuals— particularly in their own homes—constitutes a significant use of force and may be unreasonable where the circumstances do not justify such an intrusion. *See* Baird, 576 F.3d at 346-47; *McDonalds*, 966 F.2d at 294. Plaintiffs assert that Stiger and James were unarmed, non-threatening minors and that Aguirre pointed his gun directly at them and used physical force against James without provocation. If a jury credited plaintiffs' version, it could conclude that Aguirre used more force than was objectively reasonable under *Graham.*

Because plaintiffs' account, if credited, could support a finding that Aguirre violated the Fourth Amendment, summary judgment is denied as to Defendant Aguirre on Count 4.

### f. Laksanaprom

Plaintiffs assert that Laksanaprom used excessive force during Incident 4. According to the plaintiffs, Laksanaprom drew and pointed his taser at Stiger after he opened the door to the apartment. R. 143 ¶ 86. Defendants dispute this, saying that Laksanaprom drew "his taser at the low ready position pointing downwards and a little off to the side." R. 117 ¶ 73.

The Court first determines whether a genuine dispute of material fact exists. Because the parties offer conflicting accounts regarding whether Laksanaprom pointed a taser at Stiger, that constitutes a dispute of fact material to the objective reasonableness inquiry under *Graham.*

Proceeding to the second step, the Court asks whether, crediting the plaintiffs' version of events, a reasonable jury could find excessive force. Although body camera footage is part of the record, the footage does not "blatantly contradict[]" the plaintiffs' version of events such that no reasonable jury could credit it. *Harris,* 550 U.S. at 380. P-10 at 2:09:00 (showing Laksanaprom's taser); D-14 at 2:09:00 (same). Accordingly, the Court must evaluate the excessive force claim based on the facts as the plaintiffs describe them.

The Seventh Circuit has held that pointing a weapon—including a taser—at non-resisting individuals, especially minors inside their home, constitutes a significant use of force that that may be unreasonable when the circumstances do not justify such actions. *See Baird,* 576 F.3d at 346-47; *McDonald,* 966 F.2d at 294. If a jury credited the plaintiffs' version—that an officer pointed a taser at a non-threatening minor—it could conclude that Laksanaprom used more force than was objectively reasonable under *Graham.* Accordingly, because plaintiffs' account could support a finding of a Fourth Amendment violation, summary judgment is denied as to Defendant Laksanaprom on Count 4.

3. Qualified Immunity

17

In the alternative, defendants also argue that the individual officers are entitled to qualified immunity on the excessive force claims. At summary judgment, however, qualified immunity cannot be resolved where the parties' factual accounts materially diverge. *Chelios,* 520 F.3d 678, 691 (7th Cir. 2008). This is because the qualified immunity inquiry depends on the officer's conduct as it would be understood on the plaintiffs' version of the facts, and the Court cannot choose between competing factual narratives on summary judgment. *See Weinnmann,* 787 F.3d at 450.

Here, excessive force claims turn on disputed facts—such as whether the officers ran at and tackled Stiger without justification and whether they pointed firearms or tasers directly at the minors. Because resolution of qualified immunity depends on factual questions that cannot be resolved at summary judgment, defendants request for qualified immunity on the excessive force claims is denied.

### D. Unreasonable Seizure (Count 7)

The plaintiffs assert this claim against "all defendant officers who seized and detained them, including officers Aguirre, Ahmed, Elmesquine, Gajewski, Laksanaprom, Lopez (Alex), Riordan, McCormick, Zaib, Paredes, and Sgt. Quadri."[9] Plaintiffs allege that the defendant officers unlawfully seized and detained them during the events of Dec. 24, 2019, without probable cause or reasonable suspicion. R. 45 ₱ 169-178. Defendants move for summary judgment, arguing that the undisputed facts show that each officer who detained plaintiffs had probable cause or, at minimum, reasonable suspicion to do so. R. 116 at 19.

Before turning to the merits, the Court briefly addresses two preliminary matters. First, the Court clarifies the terminology used in connection with Count 7. The parties refer to this claim inconsistently throughout their briefing, at times describing it as a "false arrest" claim, a "false arrest/unlawful detention claim," or a "false arrest/false imprisonment claim." The Fourth Amendment prohibits unreasonable searches and seizures. Plaintiffs' allegations in Count 7 encompass several different kinds of seizures arising from the events of Dec. 24, 2019. Because these allegations involve multiple types of seizures subject to different legal standards, the Court refers to Count 7 collectively as a claim for Unlawful Seizure and evaluate each challenged interaction under the appropriate Fourth Amendment standard.

Second, plaintiffs do not develop any specific arguments as to how officers Elmesquine, Paredes, Riordan, Ahmed, Aguirre and Laksanaprom participated in unlawful seizures against the plaintiffs, nor do they respond to arguments by the defendants about why summary judgment should be granted as to these defendant officers.[10] *See* R. 144 at 16-36. *Id.* Claims not developed

---

[9] Plaintiffs state they have withdrawn their false arrest and/or unreasonable seizure claim against Riordan for the incident at Loyola Station. *See* R. 144 n.2. In the same footnote, the plaintiffs also state that they have withdrawn false arrest claims against Gajewski and Lopez related to the incident inside the rear entrance of 1227 Albion, but maintain an unreasonable seizure claim against them.

[10] Specifically, Elmesquine is mentioned as being alongside Quadri and Ahmed when Ahmed unlocked the door to plaintiffs' apartment, but no specific allegations are made as to Elmesquine unlawfully seizing either plaintiff. *See* R. 144 at 33. Paredes is alleged to have pointed a gun at Stiger during his arrest in the plaintiff's excessive force claim of their summary judgment

18

at summary judgment are considered abandoned. *See Palmer,* 327 F.3d at 597-98. Accordingly, the unlawful seizure claim is treated as abandoned as to Elmesquine, Paredes, Riordan, Ahmed, Aguirre and Laksanaprom, and summary judgment is granted in their favor.

    1.  <u>Legal Standard</u>

The Fourth Amendment prohibits unlawful seizures. U.S. Const. amend. IV. A seizure occurs when, under the totality of the circumstances, a reasonable person would not feel free to leave. *See United States v. Mendenhall*, 446 U.S. 544, 554-58 (1980).

Not all seizures require the same level of justification. Police officers may conduct a brief investigatory stop—commonly called a "Terry stop"—when they have reasonable suspicion that criminal activity is afoot. *See Terry v. Ohio,* 392 U.S. 1, 21-22 (1968). Reasonable suspicion requires "specific and articulable facts" that, taken together, would lead an officer to suspect that a person is involved in criminal activity. *Id.* at 21; *see also Navarette v. California,* 572 U.S. 393, 396-97 (2014).

By contrast, a full custodial arrest must be supported by probable cause. *Alcorn v. City of Chicago, Illinois*, 83 F.4th 1063, 1066 (7th Cir. 2023) ("Probable cause is essential to make a custodial arrest"). Probable cause exists when the facts and circumstances known to the officer would warrant a reasonable belief that the suspect has committed, is committing, or is about to commit a crime. *Beck v. Ohio,* 379 U.S. 89, 91 (1964); *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979). The existence of probable cause is an absolute defense to a Fourth Amendment claim for false arrest. *See, e.g.*, *Holmes v. Village of Hoffman Estates*, 511 F.3d 673, 679-680 (7th Cir. 2007). Whether a seizure constitutes a brief investigatory stop or a full arrest depends on the totality of the circumstances, including the degree of restraint used and the duration of the detention. *See United States v. Bullock,* 632 F.3d 1004, 1015 (7th Cir. 2011); *United States v. Tilmon,* 19 F.3d 1221, 1224 (7th Cir. 1994).

A limited protective frisk is permissible during an investigatory stop if the officer has reasonable suspicion that the person is armed and dangerous. *Terry*, 392 U.S. at 27. The purpose of such a frisk is to allow officers to conduct their investigation without fear of violence, not to discover evidence of a crime. *Id.* The scope of the frisk is limited to a pat-down for weapons and may not exceed what is necessary to determine whether the suspect is armed. *Id.* at 29.

The Fourth Amendment also prohibits unreasonable seizures of personal property. *Soldal v. Cook County,* 506 U.S. 56, 61 (1992). A seizure of property occurs when there is a meaningful interference with an individual's possessory interests in that property. *Id.*

---

response, but the gun pointing allegation is not mentioned within plaintiffs' unlawful seizure claim in their summary judgment response. *See* R. 144 at 19. Plaintiffs allege that Paredes and Riordan did not have probable cause to arrest Stiger, but no specific conduct related to seizure is attributed to either of them in plaintiffs' response. *Id.* While plaintiffs' Rule 51.6 statements allege that Ahmed touched Stiger on the shoulder before he was tackled and used Stiger's house keys to open the door to the plaintiffs' apartment, the plaintiffs do not argue that these actions constituted an unlawful seizure in their summary judgment response. *Id.* at 32. Finally, plaintiffs do not make any unlawful seizure claims against Aguirre and Laksanaprom in their summary judgment response. *Id.* at 16-36.

The Court evaluates each challenged seizure based on the facts known to the officer at the time the seizure occurred.

2. <u>Analysis</u>

Plaintiffs' unreasonable seizure claim arises from several encounters between the plaintiffs and defendant officers during the events of Dec. 24, 2019. In chronological order:

a. *Incident 1*

The plaintiffs make three separate seizure claims against defendants regarding Incident 1, when Stiger was allegedly tackled: 1) an unlawful detention claim, 2) an unreasonable frisk claim, and 3) an unreasonable seizure of property claim. *See* R. 144 at 18-36.

i. *Unlawful Detention Claim*

Plaintiffs contend that Quadri, Ahmed, Zaib, McCormick, Paredes, and Riordan unlawfully detained Stiger during Incident 1. *See* R. 144 at 19. As previously discussed, plaintiffs have abandoned Count 7 claims as to Ahmed, Paredes, and Riordan. Thus, the Court considers the unlawful detention only as to Quadri, Zaib and McCormick.

Plaintiffs argue that the officers lacked probable cause or reasonable suspicion to detain Stiger and that the officers' actions—including Quadri and Zaib tackling him, and McCormick placing him in handcuffs—constituted an arrest unsupported by probable cause. *See* R. 144 at 24. Defendants respond that the officers had probable cause—or at least reasonable suspicion—to detain Stiger based on information suggesting that he had been trespassing in the parking garage and that he had fled from police. *See* R. 161 at 10.

But what information did these officers have? The parties dispute what information the officers possessed at the time Stiger was detained and whether that information connected him to the suspected trespassing incident. *See* R. 144 at 19; R. 161 at 10. At the point that Stiger and Herbert left the apartment building through the front door, Quadri, Zaib, and McCormick knew only that they were Black males who appeared to be teens. That may have provided a basis to detain them briefly to ascertain whether they were lawfully in the apartment building, but a reasonable jury could conclude that using force, handcuffing, and detaining them for more than a brief period was not reasonable.

Because the existence of probable cause or reasonable suspicion depends on the facts known to the officers at the time, a genuine dispute of material facts exists. Although body camera footage is part of the record, the footage does not "blatantly contradict[]" the plaintiffs' version of events such that no reasonable jury could credit it. *Harris,* 550 U.S. at 380. Indeed, the video evidence captures Quadri apologizing to Stiger and Herbert for the fact that the officers had limited information before detaining them. "Sorry about that, man," says Quadri. "We're only humans bro, we're not God, we don't know everything until we figure it out." P-23 at 1:58:04; D-38 at 1:58:04. Accordingly, the Court must evaluate the unlawful seizure claim based on the facts as the plaintiffs describe them.

Viewing the evidence in the light most favorable to the plaintiffs, a reasonable jury could conclude that the officers lacked probable cause or reasonable suspicion to seize and handcuff Stiger. Summary judgment is therefore denied as to Quadri, Zaib, and McCormick on the unlawful detention claim.

ii. *Unreasonable Frisk Claim*

Plaintiffs contend that McCormick and Zaib unlawfully frisked Stiger during Incident 1. *See* R. 144 at 27. Plaintiffs argue that the officers lacked reasonable suspicion to believe that Stiger was armed and dangerous and that the frisk exceeded the permissible scope of a Terry search. *Id.* Defendants respond that the frisk was justified because officers believed the officers believed the individuals they were pursuing might be armed. *See* R. 161 at 20.

The parties dispute whether officers had reasonable suspicion to believe Stiger was armed and dangerous at the time of the frisk. Because the existence of reasonable suspicion depends on the facts known to the officers at the time, a genuine dispute of material fact exists. Although body camera footage is part of the record, the footage does not "blatantly contradict[]" the plaintiffs' version of events such that no reasonable jury could credit it. *Harris,* 550 U.S. at 380; P-12 at 1:48:10 (McCormick searches Stiger's clothing while asking "alright man, do you got anything on you?"); D-10 at 1:48:10 (same). Accordingly, the Court must evaluate the unreasonable frisk claim based on the facts as the plaintiffs describe them. Viewing the evidence in the light most favorable to the plaintiffs, a reasonable jury could conclude that the frisk lacked reasonable suspicion or exceeded the permissible scope of a *Terry* pat-down. Summary judgment is therefore denied as to McCormick and Zaib on the unreasonable frisk claim.

### iii.     Unreasonable Seizure of Property Claim

Plaintiffs contend that McCormick unlawfully seized Stiger's house keys during Incident 1. *See* R. 144 at 32. Defendants respond that the seizure of his keys was necessary for "safety purposes." R. 161 at 22 ("[A]fter feeling a hard object, Officer McCormick lawfully recovered the keys from Stiger's pocket because in his experience the keys could be used as a weapon."). Plaintiffs argue that McCormick had no legitimate basis to take the keys, and there was no evidence that Stiger was armed and dangerous nor any indication that he would use the keys a weapon. *Id.* at 33-34. Because the parties dispute whether McCormick had a reasonable basis to seize, or retain the keys, a genuine dispute of material fact exists.

Although body camera footage is part of the record, the footage does not "blatantly contradict[]" the plaintiffs' version of events such that no reasonable jury could credit it. *Harris,* 550 U.S. at 380. P-12 at 1:48:16 (McCormick pulls Stiger's keys out of his pocket); D-10 at 1:48:16 (same); P-17 at 1:51:48 (McCormick still has the keys, throws them to Ahmed, who uses them to open 1227 Albion door); D-30 at 1:51:48 (same). Accordingly, the Court must evaluate the unreasonable seizure claim based on the facts as the plaintiffs describe them. Viewing the evidence in the light most favorable to plaintiffs, a reasonable jury could find conclude that the seizure of Stiger's keys was unreasonable under the Fourth Amendment. *See,e.g., Gentry v. Sevier*, 597 F.3d 838, 848 (7th Cir. 2010) (finding that an officer seizing garage keys violated the plaintiffs' Fourth Amendment rights); *United States v. Place,* 462 U.S. 696, 716 (1983) (stating that *Terry* does not authorize seizure of personal property). Summary judgment is therefore denied as to McCormick on the unreasonable seizure of property claim.

### b.  Incident 2

Plaintiffs contend that Quadri unlawfully seized James during Incident 2, when he entered the apartment. R. 144 at 34-35. The plaintiffs argue that Quadri's entering the apartment and questioning James flanked by two other officers, all with guns holstered on their hips, would have caused a reasonable person—particularly a child—to believe that he was not free to leave. *Id.* Defendants respond that Quadri's conduct did not constitute a seizure—he was "performing a community care function" to "check on his well-being" and "confirm that Stiger resided at the

residence and was allowed to be there." R. 161 at 23-24. Defendants further argue that Quadri made no "use of force or show of authority that compliance with his brief questions was required," the officers were "generally in the vicinity" but not "flanking" Quadri, none of the officers drew or displayed firearms, and Quadri used a friendly tone of voice while speaking with James. *Id.* at 24.

The parties dispute the nature of Quadri's interaction with James and whether his conduct would have caused a reasonable person in James's position to believe that he was not free to leave. And here, again, it is relevant that James did not open the door to the police; rather, the officers unlocked and opened the front door. At the point that a resident discovers that police have opened his locked front door and are standing in the doorway, blocking any exit, a reasonable jury could have concluded that the lone occupant of the apartment would not have felt free to leave or to ignore their questions. To be sure, James did not appear frightened or intimidated by Quadri and the other police officers with him, but that is not the test. Because this issue depends on contested facts, a genuine dispute of material fact exists. Although body camera footage is part of the record, the footage does not "blatantly contradict[]" the plaintiffs' version of events such that no reasonable jury could credit it. *Harris,* 550 U.S. at 380; P-11 at 1:52:59 (Quadri speaks to James); D- 21 at 1:52:59 (same). Accordingly, the Court must evaluate the unlawful seizure claim based on the facts as the plaintiffs describe them. Viewing the evidence in the light most favorable to the plaintiffs, a reasonable jury could conclude that Quadri's conduct constituted a seizure under the Fourth Amendment. Summary judgment is therefore denied as to Quadri.

> c. *Incident 3*

The plaintiffs contend that Gajewski and Lopez unlawfully seized Stiger during Incident 3, when they questioned Stiger.  Plaintiffs argue that "a reasonable person in Stiger's shoes— observing two uniformed police officers, both visibly armed with a gun and a baton, one visibly carrying a taser, yelling at him, sequentially, "hey!" and then, sequentially, "come here!"—would not think he was free to leave." R. 144 at 35. Plaintiffs also argue that there is evidence that Gajewski and Lopez did not have reasonable suspicion that Stiger had committed a crime when they seized him. *Id.* at 35-36. Defendants respond that the officers did not seize Stiger, they "spoke with Stiger for less than three minutes until a non-defendant Officer confirmed that the other Officer had already spoken with Stiger." R. 161 at 18. Furthermore, defendants argue that they had a "reasonable articulable suspicion to believe Stiger had committed criminal trespass," because Gajewski and Lopez had spoken with Stranski, Aguirre and Laksanaprom in the rear stairway, "where they were informed that the suspects forced entry into the building after running from officers and had entered the rear door to Apartment 3D." *Id.*

Because the existence of reasonable suspicion depends on the facts known to the officers at the time, and the parties dispute what information Gajewski and Lopez knew about Stiger's trespassing incident at the time they spoke to him, a genuine dispute of material fact exists. Although body camera footage is part of the record, the footage does not "blatantly contradict[]" the plaintiffs' version of events such that no reasonable jury could credit it. *Harris,* 550 U.S. at 380; P-21 at 2:05:51 (Lopez and Gajewski say "Hey! Come here!" to Stiger and then question him on the stairs); D-28 at 2:05:51 (same). Accordingly, the Court must evaluate the unlawful seizure claim based on the facts as the plaintiffs describe them. Viewing the evidence in the light most favorable to the plaintiffs, a reasonable jury could conclude that Gajewski and Lopez lacked reasonable suspicion to detain Stiger. Summary judgment is therefore denied as to Gajewski and Lopez.

### 3. Qualified Immunity

In the alternative, the officers contend that their actions are cloaked in qualified immunity. R. 161 at 26. When facts material to a claim of qualified immunity remain in dispute, however, summary judgment is inappropriate. *See Morfin,* 349 F.3d at n. 13. Thus, because the facts related to Count 3 are disputed, a finding of qualified immunity is not feasible on this motion for summary judgment. Thus, for the reasons stated above, defendants' motion for summary judgment on Count 7 is denied as to Quadri, Zaib, McCormick, Gajewski, and Lopez. Summary judgment is granted as to Elmesquine, Paredes, Riordan, Ahmed, Aguirre and Laksanaprom.

## III.   **Failure to Intervene Under § 1983 (Count 13)**

Plaintiffs assert a claim for failure to intervene against Defendants Quadri, Ahmed, Zaib, McCormick, Paredes, Riordan, Elmesquine, Stachula, Lopez, Gajewski, Laksanaprom, and Aguirre.[11] R. 144 at 64.

### A. Legal Standard

An officer may be liable under §1983 for failing to intervene to prevent another officers' constitutional violation if the officer had reason to know that a constitutional violation was being committed and had a realistic opportunity to prevent the harm from occurring. *Byrd v. Brishke*, 466 F.2d 6, 11 (7th Cir. 1972); *Yang v. Hardin,* 37 F.3d 282, 285 (7th Cir. 1994).

### B. Analysis

Defendants argue that summary judgment should be granted the plaintiffs' failure-to-intervene claim because no underlying constitutional violation occurred. *See* R. 161 at 63-64. The Court disagrees. As discussed throughout this opinion, genuine disputes of material fact remain regarding many of the constitutional claims in this case. Because a reasonable jury could conclude that one or more constitutional violations occurred, the Court cannot conclude as a matter of law that none of the defendant officers lacked a realistic opportunity to intervene. *See, e.g., Abdullahi v. City of Madison*, 423 F.3d 763, 774 (7th Cir. 2005) ("Thus, given that the excessive force claim against Brooks is not amenable to summary judgment, the associated failure to intervene claims must go to trial as well.").

That said, the Court will consider each alleged constitutional violation to determine whether each officer named by plaintiffs in this Count—Quadri, Ahmed, Zaib, McCormick, Paredes, Riordan, Elmesquine, Stachula, Lopez, Gajewski, Laksanaprom, and Aguirre—had a reasonable opportunity to intervene.

Because the Court granted summary judgment on the plaintiffs' Fourteenth Amendment claim, the only remaining constitutional claims are the plaintiffs' Fourth Amendment claims: Unlawful Warrantless Entry for Incidents 2 and 4 (Counts 3 and 6), Excessive Force (Count 4), Unreasonable Manner of Entry and Search (Count 5), and Unlawful Seizure (Count 7).

---

[11] Plaintiffs have withdrawn their failure-to-intervene claims as to "Quadri and Zaib's tackle of Jaylin as well as Paredes' gun-pointing at Jaylin in front of 1227 Albion, for lack of a realistic opportunity to intervene." Plaintiffs have also withdrawn their failure-to-intervene claim with respect to Riordan's detention and questioning of Jaylin in front of Loyola station. Finally, plaintiffs have withdrawn their failure-to-intervene claim against Stranski. R. 144 at 64 n. 31.

1. Unlawful Warrantless Entry Claims (Count 3 and 6)

    a. *Count 3*

Count 3 alleges that Quadri violated the Fourth Amendment through his unlawful warrantless entry into the plaintiffs' apartment. R. 144 at 49. A reasonable jury could not find that Quadri failed to intervene because "one cannot fail to intervene in one's own conduct." *Velez v. City of Chicago*, No. 1:18-CV-08144, 2023 WL 6388231 (N.D. Ill. Sept. 30, 2023); *see also Thompson v. Vill. of Monee*, 2013 WL 3337801, at *13 (N.D. Ill. July 1, 2013) (dismissing failure-to-intervene claim with prejudice because officer-defendant "cannot possibly intervene to stop his own conduct"); *Rosario v. City of Chicago*, 2012 WL 1319806, at *9 n.2 *(N.D. Ill. Apr. 17, 2012)* (granting summary judgment on failure-to-intervene claim "because [officer] cannot be said to have failed to intervene in what [plaintiff] contends was his own conduct").

However, Ahmed and Elmesquine accompanied Quadri to the plaintiffs' apartment door during this incident and waited in the hall as he opened the door. R. 143 ¶ 59, 61; R. 117 ¶ 40-41. Thus, a reasonable jury could find that the officers witnessed Quadri committing a constitutional violation by unlawfully entering the apartment and failed to intervene to stop him from doing so. Therefore, summary judgment is denied as to Ahmed and Elmesquine on the failure to intervene claim for Count 3.

    b. *Count 6*

Count 6 alleges that Aguirre and Laksanaprom violated the Fourth Amendment through their unlawful warrantless entry into the plaintiffs' apartment. R. 144 at 60-61. A reasonable jury could find that the officers witnessed each other committing a constitutional violation by unlawfully entering the apartment without a warrant or valid exception to the warrant requirement, and failed to intervene to each other from doing so. Thus, summary judgment is denied as to Aguirre and Laksanaprom on the failure to intervene claim for Count 6.

2. Excessive Force (Count 4)

Count 4 alleges that several officers used excessive force against the plaintiffs in violation of the Fourth Amendment. The plaintiffs made excessive force claims based on events that occurred during Incident 1 and Incident 4, so the Court will assess each event in turn.

    a. *Incident 1*

Plaintiffs have withdrawn all failure to intervene claims regarding excessive force allegations that occurred during Incident 1 (including Zaib and Quadri's alleged tackle of Stiger and Paredes alleged gun pointing). *See infra* n. 11. Thus, the Court proceeds to assess Incident 4.

    b. *Incident 4*

During Incident 4, plaintiffs allege that Aguirre and Laksanaprom used excessive force by pointing a firearm and a taser, respectively, at Stiger and James. A reasonable jury could find that the officers witnessed each other committing a constitutional violation by excessive use of force and failed to intervene to each other from doing so. Summary judgment is denied as to Aguirre and Laksanaprom on the failure to intervene claim for Count 4.

3. Unreasonable Manner of Entry and Search (Count 5)

24

Count 5 alleges that officers executed the entry into the plaintiffs' apartment in an unreasonable manner. R. 145 ¶¶ 151-156. The plaintiffs' unreasonable manner of entry claim is based on events that occurred during Incident 2 and Incident 4, so the Court will assess each event in turn.

### a. Incident 2

During Incident 2, plaintiffs allege that Quadri's manner of entry was unreasonable because he failed to knock and announce before entering the plaintiffs' apartment. R. 143 ¶ 62. A reasonable jury could not find that Quadri failed to intervene because "one cannot fail to intervene in one's own conduct." *Velez*, No. 1:18-CV-08144, 2023 WL 6388231.

However, Ahmed and Elmesquine accompanied Quadri to the plaintiffs' apartment door during this incident and waited in the hall as he opened the door. R. 143 ¶ 59, 61; R. 117 ¶ 40-41. *Id.* Thus, a reasonable jury could find that the officers witnessed Quadri committing a constitutional violation by failing to knock and announce, and failed to intervene to stop him from doing so. Therefore, summary judgment is denied as to Ahmed and Elmesquine.

### b. Incident 4

Plaintiffs allege that during Incident 4, Aguirre and Laksanaprom violated the Fourth Amendment through their failure to knock and announce before entering the plaintiffs' apartment. R. 144 at 49. The Court granted summary judgment on the plaintiffs' unreasonable manner of entry claims against Aguirre and Laksanaprom, because the Court found that the plaintiff had abandoned their claims as to these officers. Without a viable underlying constitutional claim against Aguirre and Laksanaprom on Count 5, the plaintiffs cannot make a failure to intervene claim against them. Likewise, summary judgment is denied as to Aguirre and Laksanaprom.

4. Unlawful Seizure (Count 7)

Count 7 alleges that officers unlawfully seized plaintiffs during several different incidents. The plaintiffs made unlawful seizure claims based on events that occurred during Incidents 1, 2, and 3, so the Court will assess each incident in turn.

### a. Incident 1

Plaintiffs have withdrawn failure to intervene claims regarding Zaib and Quadri's alleged tackle of Stiger and Paredes alleged gun pointing during Incident 1. *See infra* n. 11. Thus, Zaib, Quadri, and Paredes cannot be held liable for failure to intervene in Quadri and Zaib's alleged tackle nor in Paredes' alleged gun pointing.

However, plaintiffs maintain that Stachula, Quadri, Ahmed, Zaib, Mcormick, Paredes and Riordan all had the opportunity to intervene to stop McCormick from handcuffing Stiger and to stop McCormick and Zaib from frisking Stiger and seizing his keys. R. 144 at 65.

Because McCormick is directly implicated in both the handcuffing and frisk and seizure incidents, a reasonable jury could not find that McCormick failed to intervene because "one cannot fail to intervene in one's own conduct." *Velez v. City of Chicago*, No. 1:18-CV-08144, 2023 WL 6388231 (N.D. Ill. Sept. 30, 2023). Likewise, because Zaib is directly implicated in the frisk and seizure claim, a reasonable jury could not find that Zaib failed to intervene on his own frisk and seizure because "one cannot fail to intervene in one's own conduct." *Velez v. City of Chicago*, No. 1:18-CV-08144, 2023 WL 6388231 (N.D. Ill. Sept. 30, 2023). However, Zaib could be found liable for failure to intervene on McCormick's handcuffing incident.

25

Thus, a reasonable jury could find that Stachula, Quadri, Ahmed, Zaib, Paredes and Riordan failed to intervene to stop McCormick from handcuffing Stiger, and that Stachula, Quadri, Ahmed, Paredes and Riordan failed to intervene to stop McCormick and Zaib from frisking Stiger and seizing his keys. Therefore, summary judgment is denied as to Stachula, Quadri, Ahmed, Zaib, Paredes and Riordan.

### b. Incident 2

Plaintiffs contend that Quadri unlawfully seized James during Incident 2, when Quadri entered the apartment. R. 144 at 34-35. A reasonable jury could not find that Quadri failed to intervene because "one cannot fail to intervene in one's own conduct." *Velez*, No. 1:18-CV-08144, 2023 WL 6388231.

However, Ahmed and Elmesquine accompanied Quadri to the plaintiffs' apartment door during this incident and waited in the hall as he opened the door. R. 143 ¶ 59, 61; R. 117 ¶ 40-41. *Id.* Thus, a reasonable jury could find that the officers witnessed Quadri committing a constitutional violation by unlawfully seizing James and failed to intervene to stop him from doing so. Therefore, summary judgment is denied as to Ahmed and Elmesquine.

### c. Incident 3

Plaintiffs contend that Gajewski and Lopez unlawfully seized Stiger during Incident 3, when the officers questioned Stiger while armed. R. 144 at 35. Plaintiffs argue that Gajewski and Lopez "each had the opportunity to intervene to stop the other from detaining" Stiger. R. 144 at 65. Therefore, summary judgment is denied as to Gajewski and Lopez.

## C. Summary

In summary, the Court rules on the failure to intervene claim for each count as follows:

On the failure to intervene claim for Count 3 (Unlawful Warrantless Entry for Incident 2), summary judgment is denied as to Ahmed and Elmesquine. Summary judgment is granted as to the remaining officers—Quadri, Zaib, McCormick, Paredes, Riordan, Elmesquine, Stachula, Lopez, Gajewski, Laksanaprom and Aguirre.

On the failure to intervene claim for Count 6 (Unlawful Warrantless Entry for Incident 4), summary judgment is denied as to Aguirre and Laksanaprom. Summary judgment is granted as to the remaining officers—Quadri, Ahmed, Zaib, McCormick, Paredes, Riordan, Elmesquine, Stachula, Lopez, and Gajewski.

On the failure to intervene claim for Count 4 (Excessive Force), summary judgment is denied as to Aguirre and Laksanaprom. Summary judgment is granted as to the remaining officers—Quadri, Ahmed, Zaib, McCormick, Paredes, Riordan, Elmesquine, Stachula, Lopez, and Gajewski.

On the failure to intervene claim for Count 5 (Unreasonable Manner of Entry), summary judgment is denied as to Ahmed and Elmesquine. Summary judgment is granted as to the remaining officers—Quadri, Zaib, McCormick, Paredes, Riordan, Stachula, Lopez, Gajewski, Aguirre and Laksanaprom.

On the failure to intervene claim for Count 7 (Unlawful Seizure), summary judgment is denied as to Stachula, Quadri, Ahmed, Zaib, Paredes, Riordan, Elmesquine, Gajewski and Lopez. Summary judgment is granted as to McCormick, Laksanaprom and Aguirre. McCormick is the

only defendant to whom the Court granted summary judgment on the failure to intervene claim for every individual Count.

Accordingly, summary judgment is granted on the failure to intervene claim as to defendant McCormick and denied as to defendants Stachula, Quadri, Ahmed, Zaib, Paredes, Riordan, Elmesquine, Gajewski, Lopez, Laksanaprom, and Aguirre on Count 13.

## IV.  *Monell* **Claim (Count 1)**[12]

The plaintiffs allege that the City of Chicago is liable under *Monell* for maintaining policies, customs or practices that caused the constitutional violations asserted in this case. R. 45 ¶¶ 95-126. This claim is asserted only against the Defendant City of Chicago. The City moves for summary judgement on the grounds that the plaintiffs cannot establish any underlying constitutional violation. R. 116 at 57-58.

### A.  Legal Standard

Section 1983 creates a private right of action against any "person" who violates the plaintiff's federal rights while acting under the color of state law. 42 U.S.C. § 1983. In *Monell v. Department of Social Services*, the Supreme Court held that municipalities are "persons" who may be sued under § 1983. 436 U.S. at 658, 690. However, municipalities are not vicariously liable for the constitutional violations of their employees. *Id.* at 692. Rather, a municipality is only liable "for its own violations of the federal Constitution and laws." *First Midwest Bank ex rel. LaPorta v. City of Chi.*, 988 F.3d 978, 986 (7th Cir. 2021).

To establish *Monell* liability, a plaintiff must first show that a constitutional violation occurred. *See Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 235 (7th Cir. 2021). The plaintiff must then "trace the deprivation to some municipal action (i.e., a policy or custom) such that the challenged conduct is properly attributable to the municipality itself." *Id.* (internal quotation marks omitted). A plaintiff may do so by identifying: (1) an express policy that causes a constitutional deprivation when enforced; (2) a custom that is persistent and widespread, so that it is the municipality's standard operating procedure; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority. See Seventh Circuit Pattern Jury Instruction No. 7.24. Finally, the plaintiff must show that the policy or custom reflects deliberate indifference and that the municipal action was the "moving force" behind the constitutional violation. *Id.*

### B.  Analysis

The plaintiffs' *Monell* claim rests on the allegation that the City had a policy of using excessive force against children.[13] The City seeks summary judgment on the basis that the

---

[12] Judge Guzman, the previously assigned judge in this case, granted the defendants' motion to bifurcate the *Monell* claim and to stay discovery as to that claim, R. 48, and denied the plaintiffs' motion to reconsider that ruling, R. 65.

[13] In the amended complaint, the plaintiffs allege a somewhat broader policy of using "excessive force against citizens of color, including children, and against their adult family members in front of the children, which traumatizes them." They have abandoned their equal protection claim, however, and there is no evidence that any force was used on Quarnita James,

plaintiffs cannot establish an underlying constitutional violation attributable to that alleged policy. R. 116 at 57-58. The City argues that without an underlying constitutional violation, *Monell* liability cannot exist. *Id.* The City does not argue that there is no evidence to support a reasonable jury finding that a municipal policy caused any of the constitutional violations.

As noted in the discussions of the plaintiffs' underlying claims, the Court finds that there are genuine disputes of material fact regarding whether the officers used excessive force. That issue is one of the central and most vigorously contested questions in this case. Resolving it would require the Court to decide numerous factual disputes—something it cannot do at summary judgment. *Cotton*, 572 U.S. at 656.

The Court must next determine whether, viewing the evidence in the light most favorable to the plaintiffs, a reasonable jury could find that a constitutional violation occurred. The Court concludes that it could. Although body camera footage is part of the record, the footage does not "blatantly contradict[]" the plaintiffs' version of events such that no reasonable jury could credit it. *Harris,* 550 U.S. at 380. P-11 at 1:47:03 (showing tackle/takedown); D-20 at 1:47:03 (same); P-12 at 1:47:10 (showing tackle/takedown); D-21 at 1:47:10 (same); P-9 at 2:09:00 (showing Aguirre's firearm); D-11 at 2:09:00 (same); P-10 at 2:09:00 (showing Laksanaprom's taser); D-14 at 2:09:00 (same). Accordingly, the Court must evaluate the excessive force claim based on the facts as the plaintiffs describe them.

If a jury were to credit the plaintiffs' account, it could reasonably conclude that the officers used excessive force. Plaintiffs contend that officers pointed firearms at non-threatening individuals and tackled a minor who posed no threat. Seventh Circuit precedents make clear that such conduct can, under certain circumstances, constitute excessive force in violation of the Fourth Amendment. *See, e.g., Baird v. Renbarger*, 576 F.3d 340, 346-47 (7th Cir. 2009) (pointing a firearm at non-resisting persons can be excessive force); *McDonald v. Haskins*, 966 F.3d 292, 294 (7th Cir. 1992) (threatening a child with a firearm can violate clearly established Fourth Amendment law); *Morfin v. City of E. Chicago,* 349 F.3d 989 (7th Cir. 2003) (tackling a non-resisting individual can constitute excessive force). Because a reasonable jury could credit the plaintiff's version of events and conclude that the officers used excessive force, summary judgment is inappropriate on this basis.

Because genuine disputes of material fact remain and a reasonable jury could find that a constitutional violation occurred, summary judgment is denied as to the plaintiff's *Monell* claim (Count 1).

## V.     State Law Claims (Claims 8-12 and 14-15)

The plaintiffs assert multiple claims under Illinois law, including assault (Count 8), battery (Count 9), intentional infliction of emotional distress (Count 10), trespass (Counts 11 and 12), respondeat superior (Count 14), and indemnification (Count 15).

Before turning to the merits, the Court addresses the defendants' argument that the plaintiffs' state-law claims are time-barred under the Illinois Tort Immunity Act. *See* R. 116 at 53. The Act requires that actions against local public entities or their employees commence within one year of the alleged injury. 745 ILCS 10/8-10(a). Because this lawsuit was filed approximately two

---

who was not present for any of the events at issue, so the only relevant policy alleged would be a policy of using excessive force against minors.

years after the Dec. 24, 2019 incident, the defendants argue that the plaintiffs' state law claims are untimely. *See* R. 116 at 53.

Defendants are correct as to the general rule but overlook an applicable exception for minors. Under Illinois law, a plaintiff who was a minor at the time the cause of action accrued may bring suit within two years after reaching the age of 18. 735 ILCS 5/13-211; *see also Reyes v. City of Chicago*, 585 F. Supp. 2d 1010, 1016 (N.D. Ill. 2008). Stiger and James were 16 and 13 years old, respectively, at the time of the incident. This action was filed on Dec. 20, 2021, before either plaintiff reached the age of 20 (*i.e.,* age 18 plus two-year statute of limitation). Accordingly, their state-law claims are not time barred.

However, Stiger and James's mother, Quarnita, is also a plaintiff in this case, and she was not a minor at the time of the incident. Because she did not file suit within the one-year limitations period her state-law claims are time-barred. Accordingly, summary judgment is granted in favor of the defendants as to all state-law claims asserted by Quarnita (Counts 11, 12, 14, and 15).[14]

Additionally, the Illinois Tort Immunity Act shields public employees from liability in the execution or enforcement of any law unless such act or omission "constitutes willful and wanton conduct." 745 ILCS 10/2-202. Thus, to make a viable state law claim against the defendant officers, the plaintiffs must show that the officers' actions constituted willful and wanton conduct. *See Chelios v. Heavener* 520 F.3d 678, 692 (7th Cir.2008) ("Illinois courts have held that a police officer is not guilty of willful or wanton conduct unless he acted with 'actual or deliberate intention to harm or with an utter indifference to or conscious disregard for the safety of others.'")

### A. Assault Under Illinois Law (Count 8)

The plaintiffs allege that defendants Aguirre, Ahmed, Laksanaprom, Riordan, McCormick, Zaib, Paredes, and Quadri assaulted the plaintiffs by pointing their firearms and tasers directly at plaintiffs. *See* R. 45 ¶ 179-186. The defendants move for summary judgment, arguing that 1) some of the officers named in the complaint under this count did not point their firearms or tasers at the plaintiffs, and 2) the defendant officers who did point firearms or tasers were justified in doing so because they had "legitimate reasons to fear danger." R. 116 at 60.

1. Legal Standard

In Illinois, assault involves "intentional conduct that places the plaintiff in reasonable apprehension of an imminent battery." *Wagner v. Cook Cnty. Sheriff's Off.*, 453 F. Supp. 3d 1101, 1102 (N.D. Ill. 2020). Subjective fear is not enough—"[s]uch feeling must have a measure of objective reasonableness." *Hespe v. City of Chicago*, 307 F. Supp. 3d 874, 890 (N.D. Ill. 2018). To avoid state law tort immunity, the plaintiffs must show that the assault constituted willful and wanton conduct—that the officer acted with "actual or deliberate intention to harm or with an utter indifference to or conscious disregard for the safety of others." *Chelios,* 520 F.3d at 692; 745 ILCS 10/2-202.

2. Analysis

---

[14] Claims for Assault (Count 8), Battery (Count 9), and IIED (Count 10) are only asserted by plaintiffs Stiger and Lazerick. However, the remaining state law claims, for Trespass (Counts 11 and 12), Respondeat Superior (Count 14), and Indemnification (Count 15) are made by "all plaintiffs," meaning that Quarnita, the plaintiffs mother, is asserting the claim as well.

In their Amended Complaint, plaintiffs allege this claim against Aguirre, Ahmed, Laksanaprom, Riordan, McCormick, Zaib, Paredes, and Quadri. *See* R. 45 ¶ 179. However, in the plaintiff's opposition to summary judgment, they mention only Paredes, Aguirre and Laksanaprom under Count 8. Arguments not developed in response to a motion for summary judgment are treated as abandoned. *See Palmer,* 327 F.3d at 597-598. Therefore, the Court considers the plaintiffs to have abandoned claims under Count 8 for Ahmed, Riordan, McCormick, Zaib, and Quadri. Summary judgment is therefore granted as to Ahmed, Riordan, McCormick, Zaib, and Quadri on Count 8.

The Court finds that there are disputes of material fact that preclude summary judgment as to assault claims against Paredes, Aguirre and Laksanaprom. Plaintiffs allege that 1) Paredes pointed a loaded firearm at a "nonthreatening, nonresistant, fully complaint child," that 2) Aguirre shouted at the plaintiffs through their door that he was going to "break down the door and drag them out," and that 3) Aguirre and Laksanaprom pointed a loaded firearm and a taser, respectively, at the plaintiffs while "screaming angry, profane commands" at them. R. 144 at 69. Defendants argue that Aguirre and Laksanaprom had a right to display their firearm and taser, respectively, because they had "legitimate reasons to fear danger," and that "there is no evidence that any other specific officer drew or pointed their firearm in the plaintiffs' presence." R. 116 at 60.

Because the existence of and nature of any threatening conduct—including who pointed firearms and whether their actions would place a reasonable person in fear of immediate harm—depend on disputed material facts, summary judgment on the assault claim cannot be resolved on this record. Although body camera footage is part of the record, the footage does not "blatantly contradict[]" the plaintiffs' version of events such that no reasonable jury could credit it. *Harris,* 550 U.S. at 380. P-9 at 2:09:00 (showing Aguirre's firearm); D- 11 at 2:09:00 (same); P-10 at 2:09:00 (showing Laksaprom's taser); D-14 at 2:09:00 (same) Accordingly, the Court must evaluate the assault claim based on the facts as the plaintiffs describe them. In addition, the Illinois Tort Immunity Act does not shield Paredes, Aguirre and Laksanaprom from liability, because plaintiffs have presented evidence creating a genuine issue of material fact that the defendants' conduct was willful and wanton because it exhibited a conscious disregard for the plaintiffs' safety. *Chelios,* 520 F.3d at 692; 745 ILCS. Viewing the evidence in the light most favorable to the plaintiffs, a reasonable jury could find that the defendants placed the plaintiffs in imminent apprehension of a battery by pointing firearms at them, and that their conduct was willful and wanton. *Callahan v. Aldridge*, No. 10 C 0864, 2011 WL 578848 *5 (N.D. Ill. Feb. 9, 2011) (denying summary judgment and finding no tort immunity as to assault claim where defendant officers pointed guns at children). Thus, defendants' motion for summary judgment on Count 8 is denied as to Defendants Paredes, Aguirre, and Laksanaprom.

### B. Battery Under Illinois Law (Count 9)

Plaintiffs allege that defendants McCormick, Zaib, Ahmed, Aguirre, Laksanaprom committed battery against the plaintiffs by tackling, pushing, dragging and handcuffing them too tightly, causing them pain. *See* R. 45 ¶ 187-194. The defendants move for summary judgment, arguing that 1) some of the officers named in the complaint under this count did not tackle, push, or handcuff the plaintiffs at all, and 2) the defendant officers who did tackle, push or handcuff the plaintiffs were justified in doing so under the circumstances. *See* R. 116 at 61.

1. Legal Standard

Under Illinois law, a battery occurs when a defendant intentionally causes a harmful or offensive contact with another person without legal justification. *Cohen v. Smith*, 269 Ill. App. 3d 1087, 648 N.E.2d 329 \*1090 (1995). To avoid state law tort immunity, a plaintiff must show that the officers' actions constituted willful and wanton conduct—that the officer acted with "actual or deliberate intention to harm or with an utter indifference to or conscious disregard for the safety of others." *Chelios*, 520 F.3d at 692; 745 ILCS 10/2-202.

2. <u>Analysis</u>

In their Amended Complaint, the plaintiffs alleged that McCormick, Zaib, Ahmed, Aguirre, Laksanaprom and Quadri committed battery against the plaintiffs. *See* R. 45 ¶ 187. However, in the plaintiffs' summary judgment response, they mention only McCormick, Zaib, Aguirre, Laksanaprom and Quadri—but do not mention Ahmed. *See* R. 144 at 70. Arguments not developed in response to a motion for summary judgment are treated as abandoned. *See Palmer*, 327 F.3d at 597-98. Therefore, the Court considers the plaintiff to have abandoned Count 9 claims against defendant Ahmed. Accordingly, summary judgment is granted in favor of Ahmed on Count 9.

The Court finds that there are disputes of material fact that preclude summary judgment as to battery claims against McCormick, Zaib, Aguirre, Laksanaprom and Quadri. The plaintiff's clam that Quadri and Zaib "forcefully tackled Stiger," McCormick handcuffed Stiger in a "wildly uncomfortable position," Laksanaprom "wrapped Stiger's arms behind his back and handcuffed him," and Aguirre pressed James up against a wall and handcuffed his wrist, pushed forward on James's shoulder and pulled him by his handcuffed wrist. *See* R. 144 at 71. Defendants argue that the officers did not commit battery because they had "both lawful authority and legal justification to use reasonable force to detain Plaintiffs." R. 116 at 61-62. Defendants say that Quadri "grabbing onto" Stiger was reasonable because he was a "fleeing offender," that neither Stiger nor James "complained to any officer about any pain or discomfort" resulting from the handcuffing, that no officers pushed or dragged plaintiffs, and that Zaib made no unreasonable contact with Stiger and never interacted with James. *Id.*

Thus, the existence and nature of any battery depend on disputed facts: whether Zaib participated in tackling Stiger, whether Quadri tackled Stiger or Stiger went to the ground of his own accord, whether the plaintiffs experienced pain from handcuffing and complained to officers, and whether officers dragged or pushed plaintiffs. Although body camera footage is part of the record, the footage does not "blatantly contradict[]" the plaintiffs' version of events such that no reasonable jury could credit it. *Harris*, 550 U.S. at 380; P- 11 at 1:47:03 (showing tackle/takedown); D-20 at 1:47:03 (same); P-12 at 1:47:10 (showing tackle/takedown); D-21 at 1:47:10 (same); P- 9 at 2:09:00 (showing Aguirre's firearm); D-11 at 2:09:00 (same); P- 10 at 2:09:00 (showing Laksanaprom's taser); D-14 at 2:09:00 (same). Accordingly, the Court must evaluate the battery claim based on the facts as the plaintiffs describe them.

In addition, the Illinois Tort Immunity Act does not shield McCormick, Zaib, Aguirre, Laksanaprom and Quadri from liability, because plaintiffs have presented evidence creating a genuine issue of material fact that the defendants' conduct was willful and wanton because it exhibited a conscious disregard for the plaintiffs' safety. *Chelios*, 520 F.3d at 692; 745 ILCS 10/2-202. Viewing the evidence in the light most favorable to the plaintiffs, a reasonable jury could find that the defendants committed battery and that their conduct was willful and wanton. Thus,

defendants' motion for summary judgment on Count 9 is denied as to Defendants McCormick, Zaib, Aguirre, Laksanaprom and Quadri.

### C. Intentional Infliction of Emotional Distress Under Illinois Law (Count 10)

Plaintiffs allege that defendants Riordan, Zaib, McCormick, Paredes, Aguirre, Laksanaprom and Quadri acted with the intent of inflicting severe emotional distress upon the plaintiffs. *See* R. 45 ¶ 195. The defendants move for summary judgment, arguing that the officers' conduct was lawful and reasonable and therefore cannot satisfy the "extreme and outrageous" element required under Illinois law. *See* R. 116 at 62-63.

### 1. Legal Standard

To prevail on an Intentional Infliction of Emotional Distress ("IIED") claim, a plaintiff must establish: (1) the defendant's conduct was extreme and outrageous, (2) the defendant intended to inflict severe emotional distress, and (3) the defendant's conduct did cause emotional distress. *Hespe*, 307 F. Supp. 3d 874 at *890; *Cairel v. Alderden*, 821 F.3d 823, 835 (7th Cir. 2016). To meet the "extreme and outrageous" standard, "the defendants' conduct must be so extreme as to go beyond all possible bounds of decency, and to be regarded as intolerable in a civilized community." *Swearnigen-El v. Cook Cnty. Sheriff's Dep't*, 602 F.3d 852, 864 (7th Cir. 2010) (internal quotations omitted).

Although it is not the only consideration, conduct may be characterized as extreme and outrageous where it "arises out of an abuse of a position or relationship in which the defendant has authority over the plaintiff." *Woods v. Clay*, No. 01 C 6618, 2002 WL 731682 *3 (N.D. Ill. Apr. 23, 2002). "The more control which a defendant has over the plaintiff, the more likely the defendant's control will be deemed outrageous." *Lopez v. City of Chicago,* 464 F.3d 711, 721 (7th Cir. 2006). "One of the positions of authority specifically named by the Illinois Supreme Court as giving rise to extreme and outrageous conduct for abuse of that position is that of a police officer." *Woods*, No. 01 C 6618, 2002 WL 731682 at *3.

### 2. Analysis

In their Amended Complaint, the plaintiffs alleged an IIED claim against Riordan, Zaib, McCormick, Paredes, Aguirre, Laksanaprom, and Quadri. However, in the plaintiffs' summary judgment response, they allege the claim against a different set of defendants: Stranski, Quadri, Zaib, Paredes, McCormick, Ahmed, Elmesquine, Laksanaprom, and Aguirre. Thus, plaintiffs added three defendants to this Count (Stranski, Ahmed, and Elmesquine), and dropped one defendant (Riordan). In addition, the plaintiffs fail to develop any IIED allegations against Elmesquine in their summary judgment response.[15] Arguments not developed in response to a motion for summary judgment are treated as abandoned. *See Palmer*, 327 F.3d at 597-98.

---

[15] Elmesquine is mentioned only once in the plaintiffs' IIED section of their summary judgment response, in the context of an allegation against Quadri, that Quadri "commanded that Ahmed and Elmesquine 'turn off' their BWCs." R. 143 ¶ 59. This, however, is an allegation against Quadri, not Elmesquine, and a disputed one at that: while the parties agree that Ahmed and Elmesquine turned off their body cameras, they dispute whether it was Quadri or Ahmed who told the other officers to "turn off" their cameras. R. 143 ¶ 59; R. 158 ¶ 100-101. In the video footage, however, it appears clear that Quadri says "hold on, let me turn my camera off." P-11 at 1:52:08; D-22 at 1:52:08.

Therefore, the Court considers the plaintiff to have abandoned their Count 10 claim against Riordan and Elmesquine. Accordingly, summary judgment is granted in favor of Riordan on Count 10. The additional defendants added to Count 10 are considered within the analysis below.

The Court finds that there are disputes of material fact that preclude summary judgment as to IIED claims against Stranski, Quadri, Zaib, Paredes, McCormick, Ahmed, Laksanaprom, and Aguirre. The parties dispute whether the officers intended to inflict distress and whether the officers' conduct can meet the definition of "extreme and outrageous." R. 144 at 74; R. 116 at 62-63. Moreover, much of the conduct underlying the IIED allegation is disputed—such as whether officers did point guns directly at plaintiffs, which officers did so, and whether officers in fact tackled Stiger or if he went to the ground himself. *Id*. Although body camera footage is part of the record, the footage does not "blatantly contradict[]" the plaintiffs' version of events such that no reasonable jury could credit it. *Harris,* 550 U.S. at 380; P-11 at 1:47:03 (showing tackle/takedown); D- 20 at 1:47:03 (same); P-12 at 1:47:10 (showing tackle/takedown); D- 21 at 1:47:10 (same); P-9 at 2:09:00 (showing Aguirre's firearm); D-11 at 2:09:00 (same); P-10 at 2:09:00 (showing Laksanaprom's taser); D-14 at 2:09:00 (same). Accordingly, the Court must evaluate the IIED claim based on the facts as the plaintiffs describe them.

In addition, the Illinois Tort Immunity Act does not shield Stranski, Quadri, Zaib, Paredes, McCormick, Ahmed, Laksanaprom, and Aguirre from liability, because plaintiffs have presented evidence creating a genuine issue of material fact that the defendants' conduct was willful and wanton because it exhibited a conscious disregard for the plaintiffs' safety. *Chelios,* 520 F.3d at 692; 745 ILCS 10/2-202. Viewing the evidence in the light most favorable to the plaintiffs, a reasonable jury could find that the defendants intentionally inflicted emotional distress upon plaintiffs and that their conduct was willful and wanton. Thus, defendants' motion for summary judgment on Count 10 is denied as to Stranski, Quadri, Zaib, Paredes, McCormick, Ahmed, Elmesquine, Laksanaprom, and Aguirre.

### D. Trespass Under Illinois Law (Counts 11 and 12)

The plaintiffs make two trespass claims under Illinois law. In Count 11, the plaintiffs allege that officers unlawfully entered their apartment without legal justification. *See* R. 45 ¶ 203. In Count 12, the plaintiffs allege that officers unlawfully re-entered and/or remained in the apartment after they had become aware that they lacked probable cause to "seize/detain/remain/enter", which plaintiffs characterize as "failure to retreat." *Id.* ¶ 204. Defendants move for summary judgment on both counts, arguing that plaintiffs do not have a property interest in the common areas of the apartment building, defendants' entry into the apartment itself was justified by exigent circumstances, and defendants did not learn any facts requiring them to immediately retreat from the apartment. *See* R. 116 at 62. Although pled as separate counts, both claims arise under the same legal theory of trespass. The Court therefore considers Counts 11 and 12 together.

1. <u>Legal Standard</u>

In Illinois, trespass is defined as "an intentional invasion of the exclusive possession and physical condition of land." *Dietz v. Illinois Bell Tel. Co.*, 154 Ill. App. 3d 554, 507 N.E.2d 24 at *26 (1987). To constitute a cognizable trespass, an entry onto the land of another must be unauthorized. *Caldwell v. City of Chicago*, 2010 WL 2722207, at *5 (N.D. Ill. July 8, 2010), citing *People v. Goduto*, 174 N.E.2d 385, 387 (Ill. 1961). A police officer who enters a home with a valid warrant is authorized by law to be on the premises and, conversely, a police officer who unlawfully enters a home, without a warrant or exception to the warrant requirement, is not

authorized to be there and may be committing a trespass. *Holt v. Lewsader*, No. 18-CV-2169, 2020 WL 10976625 at *25 (C.D. Ill. Sept. 30, 2020); *see also Caldwell*, 2010 WL 2722207, at *5; *Dakhlallah v. Zima*, 42 F.Supp.3d 901, 918-19 (N.D. Ill. 2014).

   2.   Analysis

Count 11 alleges that officers Ahmed, Elmesquine, Quadri, Aguirre, Laksanaprom, Lopez, Gajewski, Zaib, and Arsenyan[16] committed trespass when they "forcibly entered the plaintiffs' building and apartment without probable cause or exigent circumstances." R. 45 ¶ 203.

First, plaintiffs cannot make a claim for trespass into the common areas of the building itself, as the plaintiffs do not have an exclusive property interest in the building's common areas.[17] *See United States v. Sweeney*, 821 F.3d 893, 900 (7th Cir. 2016) (a tenant has "no exclusive property interest" in the common hallways of an apartment building and any such trespass would be against the building owner, not the individual tenant). Thus, the Court grants summary judgment to Ahmed, Elmesquine, Quadri, Aguirre, Laksanaprom, Lopez, Gajewski, Zaib on Count 11 and 12 as to any allegations that any of these officers trespassed in the common areas of the plaintiffs' building.

Second, while plaintiffs allege in their complaint that Ahmed, Elmesquine, Quadri, Aguirre, Laksanaprom, Lopez, Gajewski, and Zaib trespassed, in their summary judgment response, plaintiffs only allege a trespass claim against Quadri, Aguirre, and Laksanaprom for Counts 11 and 12. *See* R. 144 at 75. Arguments not developed in response to a motion for summary judgment are treated as abandoned. *See Palmer*, 327 F.3d at 597-98. Thus, summary judgment is granted to officers Ahmed, Elmesquine, Lopez, Gajewski, Zaib on Counts 11 and 12.

As to the allegations of trespass against Quadri, Aguirre and Laksanaprom, the Court finds that there are disputes of material fact that preclude summary judgment as to whether the defendants trespassed into the plaintiff's apartment. As previously discussed, the parties dispute whether Quadri entered the apartment at all, and whether exigent circumstances existed such that justified Aguirre and Laksanaprom's entry into the plaintiff's apartment. Although body camera footage is part of the record, the footage does not "blatantly contradict[]" the plaintiffs' version of events such that no reasonable jury could credit it. *Harris,* 550 U.S. at 380; P-11 at 1:52:52 (showing Quadri opening plaintiffs' door); D-21 at 1:52:52 (same); P-9 at 2:09:00 (showing Aguirre and Laksanaprom's); P-10 at 2:09:00 (showing Aguirre and Laksanaprom's entry into Apartment 3D); D-14 at 2:09:00 (same) Accordingly, the Court must evaluate the trespass claim based on the facts as the plaintiffs describe them.

Here, taking the evidence in the light most favorable to the plaintiffs, a reasonable jury could find that the defendants entered the plaintiffs' apartment without a warrant and without the existence of exigent circumstances, and that the plaintiffs were unarmed and not a threat to anyone's safety, and thus that the defendants' presence was unauthorized and could lead to a

---

[16] Arsenyan is included in Counts 11 and 12, though he appears nowhere else in plaintiffs' complaint or in any other filing in this case. Thus, the Court assumes the plaintiffs have included Arsenyan in error and will not consider him in either count.

[17] The plaintiffs withdrew their Fourth Amendment claims against defendants who entered the buildings' common areas on this basis but did not appear to do the same for their state law trespass claim. *See* R. 144 at n.22; *see also*, *infra* n. 3.

violent confrontation, in reckless disregard for the plaintiffs' safety. *See Holt*, No. 18-CV-2169, 2020 WL 10976625 at *25 (denying summary judgment on trespass claim where officers entered plaintiffs' apartment without a warrant or exigent circumstances). Therefore, immunity should not apply, and defendants' motion must be denied on the plaintiff's Count 11 trespass claim as to Quadri, Aguirre, Laksanaprom.

In Count 12, the plaintiffs make a separate claim of trespass against the same defendants, alleging that the Quadri, Aguirre and Laksanaprom trespassed when they unlawfully re-entered and/or remained in the apartment after they had become aware that they lacked probable cause to "seize/detain/remain/enter." R. 45 ¶ 204. The plaintiffs' style this claim as a "failure to retreat" trespass claim. *Id.* However, the plaintiffs cite no case law in their summary judgment response supporting the existence of a "failure to retreat" theory of trespass under Illinois state law.[18] *See* R. 144 at 17-18. Therefore, finding no authority to support the plaintiffs' "failure to retreat" theory of trespass, the Court finds that this claim fails as a matter of law, and the Court grants summary judgment to Quadri, Laksanaprom, and Aguirre on Count 12.

In sum, defendants' motion for summary judgment is denied as to Quadri, Aguirre and Laksanaprom on Count 11 and is granted as to Quadri, Aguirre and Laksanaprom on Count 12.

### E. Respondeat Superior under Illinois Law (Count 14)

In Count 14, the plaintiffs seek to hold the City of Chicago vicariously liable under the doctrine of respondeat superior for the alleged state-law torts committed by the individual officers. *See* R. 45 ¶ 250. Defendants argue that the plaintiffs' *respondeat superior* claim fails because "the underlying claims fail." R. 116 at 63.

"Under *respondeat superior,* an employer's vicarious liability extends to the negligent, willful, malicious or even criminal acts of its employees, when those acts are committed within the scope of employment." *Fuery v. City of Chicago*, No. 07 C 5428, 2014 WL 1228718 at *6 (N.D. Ill. Mar. 25, 2014); *see also, Maynard v. City of Chicago*, 755 F. Supp. 3d 1067 at *1076 (N.D. Ill. 2024). "Conduct of servant is within the scope of employment if, but only if: (a) it is of the kind he is employed to perform; (b) it occurs substantially within the authorized time and space limits; [and] (c) it is actuated, at least in part, by a purpose to serve the master." *Id.* Chicago police officers act within the scope of their employment if they "acted while on duty, in uniform, and in the course of a police investigation," and if their actions "significantly served the objective of their employer." *Wilson v. City of Chicago,* 6 F.3d 1233, 1240 (7th Cir. 1993).

Most of the plaintiffs' state law claims survive summary judgment as to the individual officers, and a reasonable jury could conclude from the allegations in the complaint that the defendant officers were acting within the scope of their employment during the incidents alleged in this case. Here, all of the defendant officers were on duty, in uniform, acting in the course of an official police investigation, and thus serving the objective of their employer, the City of Chicago.

---

[18] The closest case the Court could find supported the notion that under Illinois law, a person commits trespass to real property when that person "remains upon the land of another, after receiving notice from the owner or occupant to depart[.]" *Lyberger v. Snider*, 42 F.4th 807, 813 (7th Cir. 2022), citing 720 ILCS § 5/21–3(a). However, that is not applicable to this set of facts, where officers allegedly entered the plaintiffs' apartment briefly, interacted with the plaintiffs, and left.

Thus, the City may be held vicariously liable for its officers' conduct under respondeat superior if a jury finds that the plaintiffs prevail on any of their state law claims. The City is therefore not entitled to summary judgment on Count 14.

### F. Indemnification Under Illinois Law (Count 15)

The plaintiffs seek indemnification from the City of Chicago under Illinois law. Under the Illinois indemnification statute, "[a] local public entity is empowered and directed to pay any tort judgment or settlement for compensatory damages ... for which it or an employee while acting within the scope of his employment is liable[.]" 745 Ill. Comp. Stat. 10/9–102. . Defendants argue that the plaintiffs' *respondeat superior* claim fails because "the underlying claims fail." R. 116 at 63-64.

Most of the plaintiffs' federal and state law claims survive summary judgment as to the individual officers, and a reasonable jury could conclude from the allegations in the complaint that the defendant officers were acting within the scope of their employment during the incidents alleged in this case, as discussed in Count 14. Thus, the City may be required to indemnify any judgment entered against the defendant officers. *Doe v. Clavijo*, 72 F. Supp. 3d 910 at *914 (N.D. Ill. 2014). The City is therefore not entitled to summary judgment on Count 15.

\*       \*       \*

The defendant's motion for summary judgment is thus granted in part and denied in part, as follows:

- **Count 1 (*Monell*):** Denied as to the City of Chicago.
- **Count 2 *(Fourteenth Amendment)*:** Granted as to all defendant officers.
- **Count 3 *(Unlawful Warrantless Entry – Incident 2)*:** Denied as to Defendant Quadri.
- **Count 4 *(Excessive Force)*:** Granted as to Defendants Riordan, McCormick, and Ahmed. Denied as to Defendants Zaib, Quadri, Paredes, Aguirre and Laksanaprom.
- **Count 5 (*Unreasonable Manner of Entry and Search*):** Granted as to Defendants Aguirre and Laksanaprom. Denied as to Defendant Quadri.
- **Count 6 *(Unlawful Warrantless Entry – Incident 4)*:** Denied as to Defendants Aguirre and Laksanaprom.
- **Count 7 *(Unlawful Seizure)*:** Granted as to Defendants Elmesquine, Paredes, Riordan, Ahmed, Aguirre and Laksanaprom. Denied as to Defendants Quadri, Zaib, McCormick, Gajewski, and Lopez.
- **Count 8 *(Assault Under Illinois Law)*:** Granted as to Defendants Ahmed, Riordan, McCormick, Zaib, and Quadri. Denied as to Defendants Paredes, Aguirre and Laksanaprom.
- **Count 9 *(Battery Under Illinois Law)*:** Granted as to Defendant Ahmed. Summary judgment is denied as to Defendants McCormick, Zaib, Aguirre, Laksanaprom and Quadri.
- **Count 10 *(IIED Under Illinois Law)*:** Granted as to Defendants Riordan and Elmesquine. Denied as to Defendants Stranski, Quadri, Zaib, Paredes, McCormick, Ahmed, Laksanaprom, and Aguirre.
- **Count 11 (*Trespass Under Illinois Law*):** Granted as to Defendant Ahmed, Elmesquine, Lopez, Gajewski, and Zaib. Denied as to Defendants Quadri, Aguirre and Laksanaprom.
- **Count 12 *(Failure to Retreat Under Illinois Law)*:** Granted as to all defendant officers.

- **Count 13 (*Failure to Intervene*):** Granted as to Defendant McCormick. Denied as to Defendants Stachula, Quadri, Ahmed, Zaib, Paredes, Riordan, Elmesquine, Gajewski, Lopez, Laksanaprom, and Aguirre.
- **Count 14 (*Respondeat Superior Under Illinois Law*)**: Denied as to the City of Chicago.
- **Count 15 (*Indemnification Under Illinois Law*):** Denied as to the City of Chicago.

In sum, defendants are entitled to summary judgment on the plaintiff's Equal Protection Claim (Count 2) and Failure to Retreat Claim (Count 12), and those claims are dismissed. Plaintiffs may proceed with their remaining claims as follows.

Plaintiffs may proceed with their *Monell* claim (Count 1) against the City of Chicago. Plaintiffs may proceed with their Unlawful Warrantless Entry Claim for Incident 2 (Count 3) against Defendant Quadri. Plaintiffs may proceed with their Excessive Force Claim (Count 4) against Defendants Zaib, Quadri, Paredes, Aguirre and Laksanaprom. Plaintiffs may proceed with their Unreasonable Manner of Entry and Search Claim (Count 5) against Defendant Quadri. Plaintiffs may proceed with their Unlawful Warrantless Entry Claim for Incident 4 (Count 6) against Defendants Aguirre and Laksanaprom. Plaintiffs may proceed with their Unreasonable Seizure Claim (Count 7) against Defendants Quadri, Zaib, McCormick, Gajewski and Lopez. Plaintiffs may proceed with their State Law Assault Claim (Count 8) against Defendants Paredes, Aguirre and Laksanaprom. Plaintiffs may proceed with their State Law Battery Claim (Count 9) against Defendants McCormick, Zaib, Aguirre, Laksanaprom and Quadri. Plaintiffs may proceed with their Intentional Infliction of Emotional Distress Claim (Count 10) against Defendants Stranski, Quadri, Zaib, Paredes, McCormick, Ahmed, , Laksanaprom and Aguirre. Plaintiffs may proceed with their State Law Trespass Claim (Count 11) against Defendants Quadri, Aguirre and Laksanaprom. Plaintiffs may proceed with their Failure to Intervene Claim (Count 13) against Defendants Stachula, Quadri, Ahmed, Zaib, Paredes, Riordan, Elmesquine, Gajewski, Lopez, Laksanaprom, and Aguirre. Plaintiffs may proceed with their Respondeat Superior Claim (Count 14) against the City of Chicago. Plaintiffs may proceed with their Indemnification Claim (Count 15) against the City of Chicago

Status hearing is set for April 21, 2026 at 9:00 a.m. to discuss whether resolution of this case is possible and if not, preparation for trial. It is so ordered.

Date: March 31, 2026

John J. Tharp, Jr.
United States District Judge

37

## APPENDIX A: BODY CAMERA FOOTAGE EXHIBIT LIST

| Ex. # | Party | Link | Officer | BWC # | Beginning Time Stamp |
|---|---|---|---|---|---|
| P4 | Plaintiffs | https://iln.box.com/s/xdrgman1j7lv0f02etnfh4pdpprvhjtg | Campos | X81191039 | 1:38:16 |
| P5 | Plaintiffs | https://iln.box.com/s/j4ovl9jna8imrg2z6hweboyjz84djbo0 | Nieta-Scott | X81181990 | 1:39:04 |
| P6 | Plaintiffs | https://iln.box.com/s/ynvmqii058ow9qih1sycr9a1g4adua2f | Hitz | X81313525 | 1:38:37 |
| P7 | Plaintiffs | https://iln.box.com/s/vytziyuaxi9yar0ex9o1xng39vvc9mtf | Stranski | X81311140 | 1:34:21 |
| P8 | Plaintiffs | https://iln.box.com/s/fi5x29igbgse3jd8xqd1nbu5104lnzsr | Riordan | X81192577 | 1:37:35 |
| P9 | Plaintiffs | https://iln.box.com/s/75kimx19o6ioz683ezqv24wzmvkhii31 | Aguirre | X81032146 | 1:44:40 |
| P10 | Plaintiffs | https://iln.box.com/s/0hwpsgb5o15lysirh8tk8lpa0ph4zrax | Laksanaprom | X81179878 | 1:44:37 |
| P11 | Plaintiffs | https://iln.box.com/s/9yo33wf8gdkpcy55er2cwjdvgb7swlny | Quadri | X81227249 | 1:46:08 |
| P12 | Plaintiffs | https://iln.box.com/s/293bx2u38doh91pisengfrlh6q5jr7y3 | McCormick | X81067649 | 1:45:45 |
| P13 | Plaintiffs | https://iln.box.com/s/t3l3d2zyogyiy6wyd12rdq15enkqqkag | Ahmed | X81393910 | 1:45:27 |
| P14 | Plaintiffs | https://iln.box.com/s/v4il0mwpkj4wyf7xz7u1go240v1qslsk | Zaib | X81157556 | 1:47:43 |
| P15 | Plaintiffs | https://iln.box.com/s/m0v8exu3bmlt4vvdhejnjdorb0lhru7t | Paredes | X81116475 | 1:44:32 |
| P16 | Plaintiffs | https://iln.box.com/s/fer5vrtzyup325x9sggwn8i1tzjgyxyw | Paredes | X81116475 | 2:01:25 |
| P17 | Plaintiffs | https://iln.box.com/s/jlab14dwa8te7d0a9bkodxwgkk5rh2co | Elmesquine | X81189427 | 1:49:30 |
| P18 | Plaintiffs | https://iln.box.com/s/6t64r9j1ll1fb3gemftklw4z9ukpek4j | Stachula | X81192580 | 1:50:09 |
| P19 | Plaintiffs | https://iln.box.com/s/9wifwpwlb6pzbjlj2ruivmxf4is0tj3y | Stachula | X81192580 | 2:00:36 |
| P20 | Plaintiffs | https://iln.box.com/s/f7cfdwn6ofxmm6zhi9cgh0i885echw3n | Riordan | X81192577 | 2:00:40 |
| P21 | Plaintiffs | https://iln.box.com/s/a9wcq3668ry4mhdol2y9rlrvfynmx6u9 | Lopez | X81192559 | 1:51:31 |
| P22 | Plaintiffs | https://iln.box.com/s/5lhrch2dcwrikfolfl21guicthllm1td | Gajewski | X81105317 | 1:43:48 |
| P23 | Plaintiffs | https://iln.box.com/s/vm51wwo1luodlp5gz4xj5lh6z62sb0c5 | Quadri | X81227249 | 1:54:21 |
| P24 | Plaintiffs | https://iln.box.com/s/i46pecpa8r1l31552ede212je8p5bntq | Estudillo | X81065578 | 1:35:41 |
| P25 | Plaintiffs | https://iln.box.com/s/knv4puevbg7krgdzqoi6gkxe98m0q3mk | Jiminez | X1221442 | 1:36:43 |
| P26 | Plaintiffs | https://iln.box.com/s/up5f49rlq2g3zn9mmblhaonhik1xonqa | Hitz | X81313525 | 1:58:23 |
| P27 | Plaintiffs | https://iln.box.com/s/bw1lo49ue8iyl2dmv6p7pb4ku9p9fy5o | Quadri | X81227249 | 2:18:11 |
| P85 | Plaintiffs | https://iln.box.com/s/59kaedi9cik35lf1bbolalg7r56znspo | Stachula | X81192580 | 2:22:54 |
| | | | | | |
| D5 | Defendants | https://iln.box.com/s/dz4fg001kyyymzsmtoocidsqsm7gyi39 | Riordan | X81192577 | 1:37:35 |
| D6 | Defendants | https://iln.box.com/s/odiyvwirck27c5wui0funuck6gv7btqp | Hitz | X81313525 | 1:38:40 |

38

| D7 | Defendants | https://iln.box.com/s/vytziyuaxi9yar0ex9o1xng39vvc9mtf | Stranski | X81311140 | 1:34:21 |
|---|---|---|---|---|---|
| D9 | Defendants | https://iln.box.com/s/1gfwkhjw1r2o4zf5qhq61jueglh4i3jc | Hitz | X81313525 | 1:40:13 |
| D11 | Defendants | https://iln.box.com/s/ljtbtw06rsj2t98sd99k1kak90dwd777 | Aguirre | X81032146 | 1:44:40 |
| D13 | Defendants | https://iln.box.com/s/fla8mbgk62x53pawqt8t2l12jgw48xoj | Stranski | X81311140 | 1:42:16 |
| D14 | Defendants | https://iln.box.com/s/wmwbwxpe1m74fm1bhmrxha5icpwikkbg | Laksanaprom | X81179878 | 1:44:37 |
| D20 | Defendants | https://iln.box.com/s/evvv2934ky3i6iezjmp2we59rrql83cc | McCormick | X81067649 | 1:45:45 |
| D21 | Defendants | https://iln.box.com/s/fnjsuw0vkodopwkw16bb56m0qig5lru8 | Quadri | X81227249 | 1:46:08 |
| D22 | Defendants | https://iln.box.com/s/jgw4qivc10nhpbl4lg0ez6h7npzhhr2r | Ahmed | X81393910 | 1:45:27 |
| D24 | Defendants | https://iln.box.com/s/qiatit2pvmds22slml3uctdsj1kd1fcn | Zaib | X81157556 | 1:47:43 |
| D25 | Defendants | https://iln.box.com/s/v88vqv9v0c1acwk53loufkqzdfg7cl3q | Paredes | X81116475 | 1:44:32 |
| D27 | Defendants | https://iln.box.com/s/jqnjsxnxljnkguxmfkuh8i9p4fjxyykn | Gajewski | X81105317 | 1:43:48 |
| D28 | Defendants | https://iln.box.com/s/ytceo65jfds7yz3balfkifqjf7i8ovof | Lopez | X81192559 | 1:51:31 |
| D29 | Defendants | https://iln.box.com/s/3d6sjdar1nd6vvlesze8cysv4l87qxyd | Stachula | X81192580 | 1:50:09 |
| D30 | Defendants | https://iln.box.com/s/14bjudoi4rjf6she8u9dblpckds21wd3 | Elmesquine | X81189427 | 1:49:30 |
| D31 | Defendants | https://iln.box.com/s/4cx3axgtp5vvoh07m3jhcumx744wchw0 | Riordan | X81192577 | 2:00:40 |
| D38 | Defendants | https://iln.box.com/s/apzgfp19k5ydchuijjug4dugfjn6s1tf | Quadri | X81227249 | 1:54:21 |

39